**STATE of Missouri, Respondent,**

v.

**Charles SMITH, Appellant.**

**No. 53794.**

Supreme Court of Missouri,
Division No. 1.

Oct. 13, 1969.

John C. Danforth, Atty. Gen., Jefferson City, D. Brook Bartlett, Special Asst. Atty. Gen., Kansas City, for respondent.

Granville E. Collins, Circuit Defender, Fulton, for defendant.

STORCKMAN, Judge.

The defendant Charles Smith was found guilty by a jury of murder in the second degree and was sentenced by the court to fifty years in the custody of the Department of Corrections pursuant to the Second Offender Act. Section 556.280, RSMo 1959, V.A.M.S. The defendant and his brother Elmer were jointly charged with first-degree murder, but the defendant was granted a severance and tried separately. He was ably represented at the trial by the public defender of Callaway County who also represents him on this appeal. The contentions on appeal are that the trial court erred in not instructing on manslaughter, that the sentence imposed is excessive, and that the trial court abused its discretion in not directing a verdict of acquittal at the close of all the evidence.

The defendant, aged 32 at the time of his trial, was serving a ten-year sentence for first-degree robbery in the Missouri State Penitentiary. He had served other terms of imprisonment in Kansas and Oklahoma. He began his career as a juvenile delinquent and was confined in some state institution almost continuously from 1953 to 1967. His brother Elmer was also a prisoner in the penitentiary. They worked in the prison furniture factory. The victim of the homicide, Gene Lewis, was also an inmate. Another inmate, George Hooper, was a close friend and companion of Lewis.

Both Lewis and Hooper worked in the prison laundry.

The evidence most favorable to the verdict was given chiefly by three prison guards who witnessed all or portions of the events connected with the homicide. James R. Kirsch was the guard officer in charge of the two top floors of the furniture factory where the Smith brothers worked. Another guard officer, Vernon Sellmeyer, Jr., was in charge of the first two floors of the factory. The laundry where the victim Lewis and his friend Hooper worked was on the ground floor of J & K Hall which was located near the furniture factory. Alexander Looten was the officer in charge of the laundry workers.

On February 9, 1965, at about 11:30 a.m., officer Kirsch checked out his workers including Charles and Elmer Smith and shook them down as they filed out of the door to go up the hill to the dining hall for the noonday meal. The inmates were not required to go in formation because it had been raining. As Mr. Kirsch followed the men up the hill, he saw Charles and Elmer standing at the northeast corner of J & K Hall. He asked them what they were waiting for but they made no reply so he told them to come along. They turned as if to obey his order but when Kirsch got to the end of K Hall he looked around and saw the Smith brothers running back towards the building corner where they had been standing.

As officer Kirsch ran after the Smith brothers, he saw that they were chasing Lewis and Hooper who were running back towards the laundry. As Lewis neared the building, he slipped and fell. Charles and Elmer Smith jumped on him and began stabbing him with what were later identified as blades from a pair of upholstery shears which had been taken from the furniture factory. Charles left Elmer and Lewis struggling on the ground and ran in the direction of the laundry door towards which Hooper had gone. Officer Kirsch grabbed Elmer's hand in which he had the

blade, pulled him off Lewis, and took him to the office of the captain of the guards.

Officer Kirsch observed that Lewis was trying to ward off his attackers with his hands but he had nothing in them. No weapons were found at the scene of the attack other than the shear blades which were taken from Charles and Elmer Smith. Elmer had a cut on his right hand between his thumb and finger. There was some evidence that this was inflicted when Elmer's hand slipped down on the blade he was wielding. There were no wounds on Charles. When Kirsch saw Charles and Elmer standing at the building corner, the workers had not yet come out of the laundry.

Officer Vernon Sellmeyer, Jr., the guard in charge of the first two floors of the furniture factory, left the building for a noon meal and was near the laundry door when he saw Lewis and Hooper come around the corner with Charles and Elmer Smith in pursuit. He saw Lewis slip and fall and saw Charles make "a few swipes at him" with some kind of weapon that looked like a knife. Charles then ran Hooper into the laundry. By this time Mr. Sellmeyer was close to Charles and pushed him back from the laundry door. Charles hesitated and then went back towards Lewis. By this time Mr. Kirsch had Elmer in custody and Lewis was lying on his back kicking. Charles resumed his attack on Lewis and stabbed him in the pit of the stomach. Lewis then attempted to get up but was unable to do so. He rolled onto his left shoulder and Charles stabbed him deeply near the center of the back. After Charles pulled out the shear, officer Sellmeyer got him by the arm and took him in custody. At first Charles refused to relinquish the shear blade but finally did so as he was being led away to the captain's office. Mr. Sellmeyer saw nothing in the hands of Lewis at any time.

Alexander Looten, the guard officer in the laundry, was checking out his workers for the noon meal when Hooper ran in the door and almost knocked him down. Officer Looten saw that Charles Smith was after Hooper with what appeared to be a knife. Hooper got a big scoop shovel and wanted to go back after the Smith brothers but Looten took the shovel from him and sent him back to the laundry. With the help of inmates, officer Looten took Lewis to the prison hospital; he was dead on arrival. Officer Looten did not see any of the altercation outside the laundry between the Smith brothers and Lewis.

Testimony of the prison physician established that the death of Lewis was caused by the wounds inflicted by the shear blades, the most severe of which was a large deep wound in the back which penetrated the region where the heart was located.

The evidence is clearly sufficient to support the verdict of second-degree murder. The defendant does not directly attack its sufficiency but asserts that the trial court abused its discretion in failing to sustain defendant's motion for a directed verdict at the close of all the evidence because the case was submitted on instructions authorizing a finding of first or second-degree murder and such theories were at war with the evidence in the case. This contention is based on the fact that Fred F. Miles, a deputy sheriff of Cole County, who acted as coroner in the absence of the regular coroner, executed a death certificate which indicated that the death of Lewis was "accidental". This was brought out on cross-examination. The witness further stated that: "Most usually in those cases that is what we were told to put."

■ The death certificate was not identified or offered in evidence and was not relied on by the state. Nor was the state responsible for its contents. If this bit of testimony had any standing, it did not tend to destroy other direct evidence in the case; its credibility and weight was for the jury. State v. Hadley, Mo., 249 S.W.2d 857, 861 [4]. The trial court did not err in submitting the case to the jury.

The defendant further contends that the court erred in refusing to give the instruc-

tion on manslaughter offered by him and in not instructing on manslaughter as a part of the law of the case whether requested or not. The defendant and George Hooper testified for the defense. It will be observed that defendant's evidence is generally supplementary rather than contradictory of the facts shown by the state's evidence.

The defendant's testimony tended to show that sometime prior to the latter part of October or the first part of November 1964 Elmer Smith had been assaulted by Lewis, Hooper, and others, who were members of a group known as the St. Louis Clique. The object of the beating apparently was to force Elmer to give up his commissary book which served as money in the penitentiary. Because of this assault, Lewis and some of his cohorts were sent to the "hole" and their commissary books were confiscated. Thereafter a "runner" came to the Smith brothers in the upholstery shop with information that Lewis and his companions were going to kill them if they did not pay Lewis for the value of the commissary books confiscated when he was sent to the "hole". Because his life had been threatened, Charles took a tack hammer from the upholstery shop and carried it with him "for protection". The tack hammer was found on his person and he was sent to the hole for ten days and put in solitary confinement for ninety days. Elmer was with him in solitary. While they were so confined, Scotty Hanks came to their cell and told them of another threat that had been made on their lives. Charles and Elmer came out of solitary the first week in February 1965. They applied for and received their commissary books. That night a "walk runner" told Charles to send his commissary book to Lewis which he refused to do but suggested that they meet in the morning and talk it over. Charles and Lewis talked the next morning during the breakfast lineup and Lewis told Charles that he was going to get the commissary books from the defendant and his brother at the noon meal or he would kill them.

In the upholstery shop during the morning the defendant took a pair of shears apart and carried half of it in his left sleeve when he left the building for the noon meal. Elmer was similarly armed. The defendant saw Lewis and Hooper after he and his brother passed the laundry door. Lewis called to him saying he wanted to see him but Charles did not stop because officer Kirsch was behind him and between the defendant and Lewis. He did slow down however and stopped with his brother at the corner of the building. That is when Kirsch caught up with them and told them to come on. The brothers followed officer Kirsch but other inmates got between them. Charles heard a noise, turned around, and saw Lewis and Hooper behind them "within reaching distance". Lewis took out a screwdriver and demanded the commissary books from Elmer. When Elmer refused Lewis lunged at him and Elmer backed away. The defendant then pulled out his shear, swung at Lewis, and hit him in the arm. At the same time Hooper kicked Charles on the leg. The defendant went after Lewis and Hooper and chased them around the building. Lewis fell and the defendant and Elmer jumped on and began stabbing him. Hooper came back and acted as if he were going to kick the defendant. The defendant left Lewis and again chased Hooper who ran into the laundry. The defendant remembered that officer Sellmeyer was there and said something to him.

The defendant then ran back to where his brother and Lewis were still fighting on the ground. When he got there officer Kirsch was trying to pull his brother and Lewis apart. The defendant swung at Lewis again. Officer Sellmeyer grabbed the defendant, pulled him away, took the blade and escorted the defendant to the office of the captain of the guards.

The defendant saw several guards after his life had been threatened but he did not tell any of them of the threats. The defendant testified he did not pull the shear out of his sleeve and hit at Lewis until

Lewis had stabbed at his brother. He did not recall how many times he had stabbed Lewis after Lewis fell but may have stabbed him in the chest and stomach as many as four times. He said he was "quite shaken up" at the time. The defendant admitted he came back to where Lewis was on the ground and stabbed him again in the stomach but denied he struck him in the back. He said he was carrying the shear for his own protection. The defendant and his brother had decided that they would not give up their commissary books. He told Elmer at work that morning that he was going to take something out to protect himself in case "those guys jumped" him.

George Hooper testified that Gene Lewis was a very good friend of his. When they left the laundry on February 9 for the noon meal, they caught up with the Smith brothers and Lewis told them he wanted the "money books". The Smiths did not comply and Lewis jerked something from his pocket that could have been a screwdriver or icepick and swung at the brothers. Hooper kicked Charles but turned and ran when the Smith brothers pulled out knives. Lewis never told Hooper that he was going to kill Charles and Elmer Smith.

The defendant asserts he was entitled to an instruction on manslaughter because the evidence shows that he and his brother had been threatened, they had been told they would be killed, were attacked on the day in question and his brother was wounded. He relies strongly on State v. Turner, 246 Mo. 598, 152 S.W. 313. In that case the defendant fatally stabbed a large and powerful man who had his arm around the head and neck of the defendant's brother, a much smaller person, and appeared about to do great physical harm to the brother. The opinion emphasized that the brother was practically helpless in the grasp of his assailant. This court held that a manslaughter instruction should have been given as well as an instruction on self-defense. The facts in the case were sufficient, if believed by the jury, to constitute a lawful provocation in that the occurrence was sudden and unexpected and of such a nature that the defendant could reasonably be said to have acted without deliberation, premeditation or malice. The ruling is not controlling on the facts of this case. And so it is with the other decisions cited by the defendant. They are not applicable to the facts before us.

■ The evidence in the record of the instant case is insufficient to justify the submission of any instruction on manslaughter. Murder in the first degree, § 559.010, contemplates a "willful, deliberate and premeditated killing." Section 559.020, pertaining to second-degree murder, provides: "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree." Section 559.040 provides that homicide shall be deemed justifiable when committed by any person in the lawful defense of his own person or that of his brother among others specified. The issue of justifiable homicide was submitted to the jury. When the jury found the defendant guilty of murder in the second degree, it necessarily found that the homicide was not justifiable as being in lawful defense of the defendant or of his brother. There is no claim the homicide was committed by accident or misfortune so as to be excusable under § 559.050.

■ Sections 559.080 through 559.130 describe specific types of crimes which the statutes have classified as manslaughter. The offense in issue does not fall in any of these categories. Section 559.070 provides: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." Culpable negligence is not here involved. Therefore, every killing of a human being is manslaughter unless done deliberately, premeditatedly or maliciously or under circumstances constituting justifiable or excusable homicide. Sections 559.010, 559.020, 559.-

040 and 559.050; State v. Gore, 292 Mo. 173, 237 S.W. 993, 997[9]; State v. Bradford, 324 Mo. 695, 24 S.W.2d 993, 996[3]; State v. Foster, 355 Mo. 577, 197 S.W.2d 313, 320–321[15, 16]; State v. Brooks, Mo., 360 S.W.2d 622, 628–629[13]; State v. Curry, Mo., 372 S.W.2d 1, 2[1]; State v. Williams, Mo., 442 S.W.2d 61, 64[4, 5].

In State v. Clough, 327 Mo. 700, 38 S.W.2d 36, 38[1], this court stated: "The authorities are fairly harmonious in holding that, in order for a homicide to be reduced from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. It is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder are absent, and therefore the crime is not murder, but manslaughter." See also State v. Davis, Mo., 365 S.W.2d 577, 582[11], and State v. Williams, Mo., 442 S.W.2d 61, 64[5].

The acts of the defendant are consistent only with murder or self-defense. The threats to which the defendant testified went back to the fall of 1964. He repeatedly stated that he and his brother armed themselves to protect their lives; once with tack hammers and finally with shear blades. Defendant's counsel in his statement to the jury outlining the expected evidence emphasized that Charles and Elmer armed themselves with the shear blades "for the purpose of protecting themselves" and that if Charles was responsible for the death of Lewis then the killing was "justifiable". On the defendant's own evidence, he expected the confrontation with the Lewis forces. There was no evidence that the defendant encountered a sudden or unexpected event that negated premeditation and malice. If the defendant was not acting in self-defense, the homicide was committed premeditatedly and maliciously and perhaps with deliberation, and he was guilty of murder.

In the Clough case, supra, 38 S.W.2d 36, 38[2], the court succinctly stated the situation: "Under this testimony there is no room for manslaughter. The killing of the deceased was not the result of a sudden provocation, calculated to excite the passion of defendant beyond control. If defendant is to be believed, he should be acquitted on the ground of self-defense. If defendant is not to be believed, then he is guilty of murder." With regard to the principle and facts involved, the Clough case is quite similar to the case at bar. On the facts of this case, the trial court likewise did not err in failing to instruct on the issue of manslaughter. State v. Hunter, Mo., 444 S.W.2d 392 (decided July 14, 1969); State v. Brooks, Mo., 360 S.W.2d 622, 628[11, 12]; State v. Smith, Mo., 240 S.W.2d 671, 675[8]; State v. Lee, 303 Mo. 246, 259 S.W. 798, 805[12, 13].

■ The defendant's final contention is that the punishment of fifty years imposed is excessive viewed in the light of all the circumstances. The defendant recognizes that the punishment is within the limits provided by law and that it was imposed by the court and not by the jury, but further informs us in the written argument that Elmer Smith obtained a change of judge, pleaded guilty, and was sentenced to ten years' imprisonment.

■ The defendant complains that under the Second Offender Act there is no opportunity to argue the extent of punishment in the trial court. Immediately after the jury returned its verdict, the court announced its intention regarding the sentence to be imposed. This gave the defendant an opportunity to make objections and suggestions with respect thereto in his motion for new trial and to argue his contentions before the trial court. The motion did state that the sentence assessed was so excessive as to violate defendant's constitutional rights but there is no specification of particular violations and we have found none.

Fixing the limits of punishment for crime is a legislative function and a sentence cannot be adjudged excessive by an appellate court when it falls within the range provided by law. Section 559.030, RSMo 1959, V.A.M.S.; State v. Wolfe, Mo., 343 S.W.2d 10, 15–16[7]; State v. Copeland, 335 Mo. 140, 71 S.W.2d 746, 752 [10]; State v. Burton, 355 Mo. 792, 198 S.W.2d 19, 23[13, 14]. Supreme Court Rule 27.04, V.A.M.R., furnishes no basis for interference when the sentence has been assessed by the trial court.

We have considered all of the questions presented and find them to be without merit. Accordingly the judgment is affirmed.

HENLEY, Alternate Judge, concurs.

SEILER, Presiding Judge, concurs in result.

HOLMAN, J., not sitting when cause was submitted.