STATE of Missouri, Respondent,

v.

Homer GINNINGS, Appellant.

No. 54932.

Supreme Court of Missouri,
Division No. 2.

May 10, 1971.

John C. Danforth, Atty. Gen., J. Michael Jarrard, Asst. Atty. Gen., Jefferson City, for respondent.

Orville C. Winchell, Lebanon, for appellant.

DONNELLY, Presiding Judge.

Appellant, Homer Ginnings, was convicted of murder in the first degree by a jury in the Circuit Court of Laclede County, Missouri, and his punishment under the provisions of the Habitual Criminal Act, V.A.M.S. § 556.280, was assessed at life imprisonment. Following rendition of judgment and imposition of sentence, an appeal was perfected to this Court. We affirm.

In early 1968, appellant spent some time in a hospital in Iowa. During his absence, the deceased, Lawrence Runge, lived in appellant's house in Lebanon with appellant's wife and children. After appellant returned home, around Thanksgiving, Runge remained in the house. There is evidence of ill-feeling, arguments, and fights between the two men.

On December 6, 1968, according to the testimony of appellant's three children, he came home from work about 5 or 5:30 p. m., left and returned with beer, and left again and returned with a rifle. After he returned with the rifle, he sat down on the couch behind Lawrence Runge, who was sitting in a chair watching television. The children then heard a shot, rushed to the living room, saw appellant lay the rifle down, and saw Runge's head slumped over in the chair. The children then went to a neighbor's house to call their mother and the police.

Appellant testified at the trial. His account of the shooting is as follows:

"Q (By Mr. Winchell) Now, Mr. Ginnings, on the night of December 6, were you in the living room or the front room of your house?

"A The living room, called the living room.

"Q Was Mr. Runge there? A Yes, sir.

\* \* \* \* \* \*

"Q All right—at that time—stand again, please—Now, did you have this particular 22 rifle that is on the table there, did you have that in your possession on the night of the 22nd—I mean on the night of December 6? A Yes, sir.

"Q And were you examining it and—

"A Yes, see those marks on there?

"Q You are referring to the gun stock?

"A The jury, you have looked it over, it was a brand new gun; I think that was the fourth bullet the best I can recall, that had been shot through the gun; it was brand new. I was asking the boy what happened to the new gun; I bought the gun for the boys. And they had this here thing here, this here thing, it was all slipped here and I had slipped this sight back down here and I was pointing, when the kids told you, you know, I would point the gun around like that and I laid the gun down.

"Q All right now, had you ever heard Mr. Runge make any obscene or vulgar statements to your children?

"A Oh, he blackguarded all the time.

"Q You say, you used the term blackguarded? A Yes, blackguarded.

"Q That is vulgar language? A Yes, sir.

"Q Now in what manner did he use the blackguard or vulgar language and to what children?

"A You mean this night that this happened?

"Q Yes, sir. A Well, my daughter.

"Q Say which one it is now. A Sharon.

"Q She is fifteen?

"A She was right near fifteen years old —she was back here putting the kids to bed.

\* \* \* \* \* \*

"Q All right; what did he say?

"A He hollered, hey, Sharon, and she answered him but she said she didn't understand what he said, she said, well what, and went ahead, just went ahead fixing the beds. He said, you think a person could get pregnant by a mouse?

"Q What did you say after he made that comment?

"A I said, watch your damn mouth, and he said, I will say anything I damn want to, that is when I grabbed the gun.

"Q What did he do?

"A He started to get up, whirl like that, and I pulled the gun up and through the excitement the gun went off; I caught him back here somewhere.

"Q All right. When he got up out of the chair were you afraid?

"A I was afraid he would chop me up, I knew he would.

"Q And this action all followed this comment that he made to your daughter, is that right? A Yes, sir."

The points raised on appeal are: (1) that the trial court erred in applying the Habitual Criminal Act; (2) that the trial court erred in failing to suppress evidence of statements made by appellant to the arresting officers while he was without counsel; and (3) that the trial court erred in failing to instruct on manslaughter.

On the record in this case, we hold: (1) that the Habitual Criminal Act was properly applied because the evidence shows appellant had been "convicted previously of an offense punishable by imprisonment in the penitentiary, that he was sentenced thereon and subsequently was imprisoned * * *." (State v. Blackwell, Mo.Sup., 459 S.W.2d 268, 272); (2) that the trial court did not err, after holding an evidentiary hearing outside the presence of the jury, in admitting in evidence statements made by appellant to the police officers because, on the evidence adduced, "these statements were not the product of any police interrogation which might have required cautionary warnings but were volunteered by appellant." (Gregg v. State, Mo.Sup., 446 S.W.2d 630, 632); and (3) the trial court did not err in failing to instruct on manslaughter because, on the evidence adduced, the killing of Lawrence Runge was not the result of a "sudden unexpected assault, encounter or provocation tending to excite the passion beyond control." (State v. Clough, 327 Mo. 700, 705, 38 S.W.2d 36, 38; State v. Smith, Mo.Sup., 445 S.W.2d 326, 331.)

The judgment is affirmed.

MORGAN, J., concurs.

FINCH, J., concurs in separate concurring opinion filed.

FINCH, Judge (concurring).

I concur in the principal opinion but in doing so would assign an additional ground for holding that failure of the trial court to instruct on manslaughter does not entitle defendant to a reversal and new trial.

Defendant was charged with first degree murder. The trial court instructed the jury on both first and second degree murder. The jury refused to convict defendant of the lesser offense of second degree murder and instead convicted him of first degree murder, necessarily finding deliberation and premeditation. That being true, it is apparent the jury would not have convicted defendant of the lesser offense of manslaughter. Hence, the error, if any, in failing to instruct on manslaughter was harmless and would not entitle defendant to relief. State v. Foran, 255 Mo. 213, 164 S.W. 215 [4] (this case was overruled later on another point but not on the above proposition). Even constitutional error does not entitle a defendant to a new trial if such error can be declared harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065, reh. den. 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241.