**STATE of Missouri, Respondent,**

**v.**

**Louis Andrew SCOTT, Appellant.**

**No. 58261.**

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1974.

John C. Danforth, Atty. Gen., Neil Mac-Farlane, Asst. Atty. Gen., Jefferson City, for respondent.

Marvin Q. Silver, Murray Stone, St. Louis, for appellant.

HIGGINS, Commissioner.

Louis Andrew Scott was convicted by a jury of murder, first degree. His punishment was assessed at life imprisonment and sentence and judgment were rendered accordingly. (Appeal taken February 15, 1973; jurisdiction retained pursuant to order April 9, 1973.)

As on previous appeal, appellant does not question the sufficiency of evidence to sustain his conviction and the evidence, including a confession of defendant, would permit the jury reasonably to find: that on April 28, 1967, Louis Andrew Scott and two others, armed with a sawed-off shotgun and a pistol, robbed a Liberty Loan Company office at 5916 Natural Bridge, St. Louis, Missouri; that during the course of the robbery, James Nolkemper, an employee of the company, was, at the direction of defendant, shot and killed by the robber holding the shotgun. Defendant did not testify and offered no evidence. State v. Scott, 482 S.W.2d 727 (Mo. banc 1972).

Appellant's first three points go to the voir dire of the veniremen. He contends that the court erred: I, in refusing to allow defendant to question veniremen whether, if defendant failed to take the stand, they would consider this failure as a factor in arriving at his guilt; II, in giving Instruction 8 over his objection, that "The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn, from the failure of the defendant to testify"; and, III, when prior to voir dire examination, it gave the veniremen a "cautionary oral instruction" in the same language as Instruction 8.

The record shows that prior to voir dire examination of the veniremen, the court and counsel conferred in chambers to consider the effect on this trial of the opinion which reversed the conviction of defendant on his first trial. That opinion held that where three veniremen were of the opinion that defendant's failure to testify would be a factor weighing against innocence which they could consider in arriving at their verdict, and where statements and explanations made to the jury by the judge and counsel were not sufficient to clearly remove such opinions, the trial court abused its discretion in not excusing one of such veniremen upon challenge for cause. State v. Scott, supra.

The trial judge asked defense counsel if it was his intention to pursue inquiry of the veniremen with respect to their feelings in the event the defendant failed to take the stand. Upon counsel's affirmative answer, the court then advised: "Then I think to avoid a recurrence of what took place in that case it will be the intention of the Court * * * to advise the jury that * * * the law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of the defendant to testify. * * * And then I

intend to ask the jury generally whether any person on the panel would have any reason whatsoever that they could not apply the law as indicated by the Court as applicable in this case. I think if there is no indication that they cannot accept this as the law of the case, I don't think counsel should be permitted to inquire into the matter."

The following then occurred:

"MR. SILVER [for defendant]: * * * I think we should be entitled to ask individual questions but whatever the Court rules, we'll abide by and preserve our record. * * *

"MR. FREDERICKS [for the State]: My feeling is that neither the attorney for the State nor the attorney for the defendant should make any comment to the panel on voir dire as to the right of necessity of the defendant to take the stand. * * * I would object to any comment being made by defense counsel as to the defendant's right to take the stand or not to take the stand. * * * I think now that the thing rests with Mr. Silver as to whether or not he is going to object to the Court's comment.

"MR. SILVER: I would not object to the Court's comments but I still think we ought to pursue the questions the way we did in the original trial. In other words, I don't think that the Court's comments still are sufficient unto themselves, that we still should be entitled to ask individual questions * * *

"THE COURT: If there is some indication, we'll cross that bridge when we come to it.

"MR. SILVER: In other words, we can ask our questions, counsel for the State can object and the Court can make it—we've preserved our record. * * *

"THE COURT: He is going to come up to the bench and indicate that he objects to the court restricting him about asking a question and I'll rule on it at that time."

Pursuant to this procedure, and in this respect, the court, at the outset of voir dire examination of each panel of veniremen and among other things peculiar to voir dire, made the three-fold statement of the law and asked qualifying questions as follows: "Now before we proceed with the counsel and their interrogation, I am going to tell you a couple of principles of law that apply to this case or any case such as this. They are simply that the defendant is presumed under the law to be innocent until he is proven guilty by the State of Missouri bringing the charges against him to your satisfaction and beyond a reasonable doubt. And the burden is upon the State of Missouri to prove the guilt of the defendant. In addition, the law does not compel the defendant in a criminal case to take the witness stand and testify and no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of the defendant to testify. Now I ask every member of this panel, * * * having heard those principles of law which are applicable to this case, does anybody on this panel feel they would not be able to follow those principles of law if and when I instruct you that they are the law applicable to this case? Is there anybody that can't do that? Is there anybody that does not? Is there anybody that disagrees with those principles of law that they would not apply them in this case? We all have some disagreements with the law. I do in many instances. I am sure lawyers do, but this is the law of the case. I must follow it and the jurors are expected and must follow it. Is there anybody who will not follow those principles of law? (No response was made by the veniremen.)"

At the conclusion of defendant's voir dire examination of the veniremen, the following occurred:

"MR. STONE [for defendant]: I would like to ask each individual juror at this time that if Mr. Scott did not take the stand would they hold it against him, or if he would not take the stand would they con-

sider it against him. MR. FREDERICKS: I would object to the question for the reason that I can't ask any questions pertaining to that. * * * The Court has covered that matter in its opening remarks.

"THE COURT: I think, Mr. Stone, that the Court has asked this jury whether they would follow the instructions with respect to the law. What is the question again that you want to ask?

"MR. STONE: That if Louis Scott chose not to take the stand would they hold this against him or consider it against him * * * That's basically the question, that if he doesn't chose [sic] to take the stand would they consider this or hold this against Mr. Scott.

"THE COURT: I think the matter has thoroughly been covered by the Court's indication that that is the law and that no juror has indicated that they wouldn't follow that rule, although it is the Court's intention that if he doesn't take the stand to give that as a formal instruction * * *. I think that you may ask them if you want whether or not when the Court instructs them with respect to the law if there is anyone that would not follow each and every instruction as to the law that's given to them by the Court. * * * I am going to sustain the objection. I think it has been fully covered."

The foregoing excerpts have been provided in detail to demonstrate ready answers to appellant's contentions I, II, and III.

■ With respect to Point I, a trial court necessarily and properly has considerable discretion in control and conduct of voir dire examination of veniremen; and an appellate court will differ or interfere with the exercise of that discretion only when the record shows a manifest abuse of dis-

cretion and a real probability of injury to the complaining party. Olsten v. Susman, 391 S.W.2d 331 (Mo.1965). This discretion applies also to the control of specific questions. Wright v. Chicago, Burlington & Quincy R. R. Co., 392 S.W.2d 401 (Mo. 1965).

■ This record shows that defendant was denied specific questions going to prospective jurors' feelings with respect to his failure to testify only after the subject was covered by the court's own specific questions. The trial court understandably, in view of the prior reversal, took particular care in this area on retrial; and there were no responses from the veniremen to the court's questions indicating disagreement with, or inability to apply, the legal principles accurately enunciated by the trial court preliminary to the questions. In such circumstances, it was hardly necessary for counsel to re-cover the same ground, and it may not be said that the court abused its discretion or that defendant was injured.

■ With respect to Point II, it is noted that this case was tried in December, 1972. In September, 1972, this court held that the giving of an instruction, over defendant's objection, that defendant was not required to testify and that failure to do so should not give rise to presumption of guilt or inference of any nature, did not violate constitutional protection against self-incrimination and was not error. State v. Smart, 485 S.W.2d 90, 94–96 [9] (Mo.1972).[1]

■ With respect to Point III, the record shows that defendant made no objection to the court's cautionary oral instruction, his objection going only to the refusal to permit questions to veniremen on the subject. Nor is there any such error charged in defendant's motion for new trial. Accordingly, Point III has not been pre-

---

1. Effective September 1, 1973, this matter is governed by Rule 26.08, V.A.M.R., and a form instruction similar to the instruction in question is given only if the defendant does not testify and requests that the instruction be given. See also MAI–CR 3.76, and Notes on Use.

served for review. Rule 27.20, V.A.M.R.; State v. Cashman, 485 S.W.2d 431 (Mo. 1972).

Appellant's remaining points go to defendant's confession. He contends the court erred in admitting the confession because at the time he confessed: IV, the circuit attorney who received the written confession failed to inform defendant that he had been indicted for murder; V, he had no counsel when he signed the confession; VI, he was not advised that he could be sentenced to death; VII, he was not advised of the applicability of the law of felony-murder; VIII, he, although generally advised of the right to counsel, was not specifically advised that he could have counsel present during his interrogation.

Appellant asserts he was indicted in the June, 1967, term of the Grand Jury; that the indictment was suppressed until filed July 18, 1967; that defendant was arrested July 6, 1967, and incarcerated for twelve days without interrogation or benefit of counsel; that the public defender's office did not formally enter appearance for defendant until his arraignment July 24, 1967, although Joseph Noskay, public defender, appeared for and consulted with defendant at lineups on the morning of July 19, 1967, prior to defendant's signing of his transcribed confession. He further asserts the substance of Points IV, V, VI, VII, and VIII to support his argument that his confession should not have been admitted. He bases his argument upon Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966): "If the interrogation continued without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. [Citing cases.] This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders."

There is considerable additional record bearing on these contentions. First is the testimony adduced at the pretrial hearing on defendant's motion to suppress his confession.

The confession was taken by Dennis Donnelly. The warnings given defendant by Mr. Donnelly appear at the beginning of the confession. "Statement of Andrew Lewis Scott [sic] taken at Police Headquarters, Tuesday, July 18, 1967 by Dennis Donnelly, Assistant Circuit Attorney and stenographer, Jeanette Burgoyne [sic], in the presence of Thomas Rowane, Detective, Homicide Division. Mr. Scott, my name is Dennis Donnelly, Assistant Circuit Attorney for the Circuit Attorney's Office. I would like to take a statement from you in regard to the robbery at Liberty Loan, April the 28th of this year. That would be approximately three months ago. Now I have to advise you that before you give this statement that you have a right to remain silent, you don't have to say anything. Anything you do say can and will be used against you in court. That you have a right to an attorney and that if you can't afford one we will get you one. Do you understand that? And his answer was 'yes'. You have also been so advised by Officers Dwyer and Rowane? Answer: Yes. You have heard this before by someone else? Answer: Yes. Question: Nothing that I have told you—you wish to make a statement? Answer: That's right. I am not going to concern myself with anything other than what happened at Liberty Loan. First of all, I would like to know who was with you. Answer: Raymond Wells and Thomas Clay. Question: About

what time did you get to Liberty Loan; do you remember? Answer: About 2:00."

Mr. Donnelly also stated that defendant was calm, there were no marks on his body, no promises were made to him, he was not mishandled or mistreated in any way, he made no requests for attorney, food or drink; and that he asked defendant questions about a holdup and shooting.

Detective Rowane stated that he and Sergeant Dwyer, prior to Mr. Donnelly's questions to defendant, advised defendant of his (Miranda) rights and questioned him concerning the crime in question. No promises were made to defendant, he was not mistreated, and he made no requests for food or drink. Detective Rowane's questions and conversation were about the robbery and killing, and he never told defendant that if he confessed to the robbery he would take his time under robbery. He was sure he had advised defendant he was charged with murder, and he advised defendant again of his rights prior to his signing of the confession.

Sergeant Phillip Dwyer discussed the robbery of Liberty Loan and the shooting of Mr. Nolkemper with defendant on July 18, 1967. Sergeant Rowane was also present. Sergeant Dwyer advised defendant of his constitutional rights, concluding with a statement that an attorney would be appointed for him before he was questioned if he so desired. Defendant stated his understanding of his rights. The questioning by Mr. Donnelly followed the questioning by Sergeants Dwyer and Rowane.

Ronald J. Pugh, a victim of the crime, was present when defendant read and signed his confession. He stated that the officers present requested defendant to read the confession and change anything with which he disagreed. The officers furnished a pen, and defendant signed each page as he read it.

Defendant's testimony on the motion was substantially in contradiction of the foregoing.

Further evidence on these issues was received at the trial.

Detective Richard Miller stated he arrested defendant July 17, 1967, the day prior to defendant's confession, at 3:30 p. m., at defendant's apartment, 4044 Washington, St. Louis. This contradicts defendant's assertion that he was arrested July 6, 1967, and left to languish for twelve days. At the time of arrest, defendant raised his hands and stated, "I'm not the one who killed that man, my partner did."

Detective Rowane reiterated his testimony at the suppression hearing. He stated also, in amplification, that Sergeant Dwyer advised defendant of his rights, including the right to an attorney and that an attorney would be provided for him before and during any questioning if defendant so desired. Defendant stated he understood his rights. He was also advised by Detective Rowane that he was charged with the murder of James Nolkemper and the robbery of Liberty Loan Company. Defendant gave a brief story of the crime and agreed to give a statement to the circuit attorney. On the following day, defendant was in a lineup, represented by an attorney from the public defender's office, and he was identified by Ronald Pugh. Following the lineup, defendant was again advised of his rights, after which he read and signed his confession in the presence of Sergeants Rowane and Dwyer and Mr. Pugh. Sergeant Rowane stated he advised defendant that he was charged with murder both before the lineup and on the previous day.

Again, the detailed record demonstrates ready answers to appellant's contentions, in this instance Points IV, V, VI, VII, and VIII.

■ The record shows: that defendant was advised that he was charged with murder prior to his confession, not only by the assistant circuit attorney but also by Sergeant Rowane; that he was advised of his right to counsel and to have counsel

present during the confession; that he was advised that he could be convicted of murder (he knew he was so charged), and it would make no difference whether it was felony-murder or conventional murder; that he was advised that he could receive the death penalty in that, under Section 560.135, RSMo 1969, V.A.M.S., robbery by means of a dangerous and deadly weapon, as well as murder, then carried the death penalty.

With respect to Point VI in particular, in the absence of advice that defendant could receive the death penalty, if so, appellant would be entitled to no relief because an accused does not have to be so advised before his subsequent confession will be admissible. See United States v. Hall, 396 F.2d 841, 845 (4th Cir. 1968): "Miranda, however, reflects the Supreme Court's concern that an accused might, to his detriment, forfeit rights afforded him by the Constitution simply because he was not aware that he possessed such rights. We do not find in that decision any intimation that knowledge of the punishment for the crime with which he was charged is a prerequisite to a valid waiver of constitutional rights and we conclude that the validity of Hall's waiver is not vitiated by the admitted absence of knowledge or information as to the possible punishment."

There is no claim, nor is there any indication of the deception, trickery, artifice, and deceit which would render defendant's confession inadmissible. See Annotation, 99 A.L.R.2d 772.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.