STATE of Missouri, Respondent,

v.

Fred **MUDGETT**, Appellant.

No. 59009.

Supreme Court of Missouri,
En Banc.

Nov. 25, 1975.

Rehearing Denied Jan. 12, 1976.

M. Randall Vanet, North Kansas City, for appellant.

John C. Danforth, Atty. Gen., William F. Arnet, Asst. Atty. Gen., for respondent.

DONNELLY, Judge.

Appellant, Fred Mudgett, was convicted of murder in the second degree by a jury in the Circuit Court of Boone County, and his punishment was assessed at 75 years imprisonment. Following rendition of judgment and imposition of sentence, an appeal was perfected to the Kansas City District of the Court of Appeals. The appeal was transferred here on the certification of a dissenting judge.

On September 20, 1971, appellant, together with two other inmates, attempted to escape from Fulton State Hospital. The parties stipulated that at that time appellant was in lawful confinement in that hospital, so that his action was violative of Section 202.435, RSMo 1969. Shortly after the beginning of working hours in the Psychology Department, appellant appeared in one of the offices with a drawn knife and accosted a woman employee. He told her to "Be quiet and you won't be hurt" or "Be quiet or I'll kill you" or some words of like import. The woman employee then screamed "George!", thereby seeking the aid of a fellow employee, George Chase. Chase responded to that call, at which point appellant yelled for one of his accomplices "to get him off." Appellant's fellow escapee, Williams, then hit Chase repeatedly with a metal mop bucket handle, causing a fatal skull fracture.

The three escapees then took the woman employee as hostage, with appellant and Herron barricading themselves with the hostage in one room, while Williams barricaded himself in a second room. Negotiations ensued between appellant and the hospital superintendent, in which appellant demanded unimpeded release from the hospital together with the furnishing of an automobile, on threat that if this was not done, the woman hostage would be raped and killed. During this period of negotiation, Williams shouted repeatedly, "I killed mine, why don't you kill the bitch, why don't you kill the bitch." After approximately an hour of talking back and forth, appellant yielded and all three escapees surrendered.

Much later that same day, deputy sheriffs were summoned to the hospital, and appellant was brought into their presence at about 5:00 p. m. One of the deputies had a tape recorder. Appellant immediately demanded that the tape recorder not be used, and the officers complied with that request. One of the deputies then began to read the Miranda warning, but after only a few words was interrupted by appellant. Appellant stated that he would not sign any waiver or give any statement so long as he was at the hospital, but that he might possibly talk later if he were removed to either the police or sheriff's department. Deputy Lee said he would see if the transfer could be arranged.

Later that same evening, officers again came to the hospital for the purpose of removing appellant from the hospital premises to the local jail. During this transportation, Deputy Lee again took out a "Miranda card" and read appellant his "rights." While en route from the hospital to the jail, appellant told the officers he would like to talk to the Sheriff's brother, Bob Salmons, whom appellant considered to be a friend.

Very soon after appellant arrived at the police station, Salmons came in and after some brief exchange of pleasantries, appellant began a narrative statement to Salmons of what had happened that morning. Essentially appellant talked and Salmons, asking few if any questions, listened.

After Salmons left, the officers again read the Miranda warning and appellant was handed a waiver of rights form. In connection with his right to consult an attorney, appellant indicated that he did have an attorney in Kansas City, but that he did not want to bother him at that time. He proceeded to sign a waiver form and to give an oral statement, which was then reduced to written form at about 9:30 p. m. The next morning appellant amplified his writ-

ten statement of the evening before by a second statement. This second statement was preceded by an additional Miranda warning by Deputy Lee.

About 1:30 p. m. on September 21, appellant was arraigned, and a local lawyer was appointed as his counsel by the court. That night appellant summoned Deputy Lee to the police station for another consultation. Lee once again read him the Miranda warning, and appellant signed still another rights waiver. Appellant then proceeded to give a third statement which differed in substantial parts from the first two. In the most damaging portions of these three statements, appellant admitted that the escape had been planned for a period of approximately a month by Williams, Herron and himself; that they had discussed the possibility of resistance; that "[a]s the person leading the escape plan I instructed the others to stop the male employee in any way possible"; and that he had always planned from the beginning to kill the female employee whom he had taken as hostage.

The information on which this case was tried charged appellant with murder in conventional form. The instructions submitted the case to the jury both on murder first degree in conventional form and also on felony-murder in the second degree based upon commission of a homicide during the course of an attempt to escape. Appellant specifically requested a manslaughter instruction, which the trial court refused to give. The jury returned a verdict of not guilty of murder in the first degree; but did find appellant guilty of murder in the second degree, with the jury being unable to agree upon a sentence. Sentence was thereafter imposed by the court.

Appellant raises six points on appeal in essence as follows: (1) that the information failed to allege an offense under § 559.020, RSMo 1969; (2) that the trial court improperly restricted voir dire examination of the jury; (3) that the evidence did not warrant a submission of murder in the first degree; (4) that an instruction on manslaughter

should have been submitted; (5) that appellant's statements should have been excluded as involuntary; and (6) that his statements should have been excluded for the reason that he did not understandingly and knowingly waive his constitutional rights.

The facts of this case, as they appear in the principal opinion written in the Kansas City District of the Court of Appeals (Wasserstrom, J.), are set forth above without quotation marks. Those portions of this opinion which deal with Appellant's Points (1), (2), (3), (5) and (6) were also written by Judge Wasserstrom and are adopted here, with minor changes, without quotation marks.

I.

*Sufficiency of the Facts to Constitute Felony-Murder*

■ Appellant argues that in order for an accused to be convicted of felony-murder under § 559.020, RSMo 1969, "the underlying felony should as a matter of logic be a felony at common law. . . ." Although appellant has cited no authority for that proposition, his concept has been adopted in some other jurisdictions. La-Fave and Scott, Criminal Law, Section 71, p. 547.

However, this concept has been rejected in Missouri. In *State v. Robinett*, 279 S.W. 696 (Mo.1926), this court held that if a homicide is committed in the course of committing any of the felonies enumerated in what is now § 559.010, RSMo 1969, that becomes murder in the first degree; while if the intention is to commit any other felony, then the act becomes murder in the second degree under what is now § 559.020. Furthermore, this court quoted with approval from Wharton on Homicide which states that a felony-murder may be based upon an underlying act which has been made into a felony by statute although not such at common law.

The common-law felony-murder rule as developed in *Robinett* has been applied since to cases involving acts which were not felonies at common law. In *State v. Shuler*, 486 S.W.2d 505 (Mo.1972), the court applied the felony-murder doctrine to a homicide occurring during the felonious discharge of a firearm into a motor vehicle. The court in *Shuler* expressly rejected a contention there made "that the crime of shooting into a motor vehicle is not statutorily defined as a felony and was not a felony at common law, and therefore the felony-murder doctrine was improperly applied." In rejecting that contention the court held that shooting into a motor vehicle is a felony in violation of § 562.070, RSMo 1969; and that since it is neither a felony listed in § 559.010, nor manslaughter, it must be considered murder in the second degree under § 559.020.

## II.

### *Fairness of the Voir Dire Examination*

During the early stages of the voir dire examination of the jury, appellant's counsel addressed the following question to the court: "We have general questions and then individual questions after the general questions?" To this the court responded; "That's normally the way we do it." Immediately prior thereto the court had asked general questions of the jury panel and whenever a venireman responded to one of those general questions, the court pursued the matter with additional specific questions. The prosecuting attorney proceeded to follow essentially the same procedure. When defense counsel undertook his questioning of the panel, he adopted the same pattern.

When this procedure had been completed, and the discussion between the court and counsel turned to the matter of challenges, defense counsel discovered that the court and prosecuting attorney considered the voir dire examination completed. Defense counsel protested, stating that in his home county the customary procedure was to have general questioning of the jurymen as a whole, just as had just been completed in this case, but then to permit counsel to interrogate each venireman individually. Appellant's counsel stated that he had understood from his question to the court and the court's answer that this was the procedure to be followed in the present case. These protests by appellant's counsel were overruled and his request to continue with further examination of the veniremen individually was denied.

That action by the trial court does not constitute grounds for reversal. The trial court has considerable discretion in the control of voir dire examination and the appellate court will interfere only when the record shows a manifest abuse of that discretion. *State v. Scott*, 515 S.W.2d 524 (Mo.1974); *Brown v. Bryan*, 419 S.W.2d 62 (Mo.1967); *Olsten v. Susman*, 391 S.W.2d 331 (Mo.1965). Nothing approaching an abuse of discretion appears here.

First of all, the procedure employed for the voir dire examination in this case finds direct approval in *State v. Richards*, 467 S.W.2d 33 (Mo.1971). Furthermore, nothing which happened in the trial court gave any reason to hold that generally permissible procedure to have been erroneous or unfair in this case.

The attorneys on both sides went into the voir dire examination with the benefit of questionnaires which had been filled out by each of the veniremen giving personal data. With that as the beginning point, extensive questioning took place in open court, taking up almost 100 pages of the transcript on appeal. Over and above the general questions put to the veniremen collectively, 44 out of a total of 60 veniremen were questioned individually by either the court or counsel; 21 of them were questioned individually by appellant's counsel himself. The curtailment of any further individual questioning was not the result of any purposeful misleading of appellant's counsel by either the court or the prosecuting attorney, but rather was attributable to defense

counsel's own failure to be more specific in his inquiry. The curtailment was reasonable, within customary limits, and cannot be said to have resulted in any reversible prejudice.

### III.

### Sufficiency of the Evidence to Support First-Degree Murder

■ The evidence outlined above amply supported a charge of first degree murder. However, an analysis of the evidence to demonstrate this fact is unnecessary, because even if the evidence were assumed to be insufficient in that regard, that would not affect the conviction of second-degree felony-murder. Inasmuch as the jury found appellant not guilty of first-degree murder, any error with respect to the submission of that charge has become harmless. *State v. Strong*, 339 S.W.2d 759 (Mo. 1960); *State v. Ashbrook*, 11 S.W.2d 1037 (Mo.1928); *State v. Howard*, 486 S.W.2d 660 (Mo.App.1972).

### IV.

### Failure to Submit a Manslaughter Instruction

■ In 1931, in *State v. Clough*, 327 Mo. 700, 705, 38 S.W.2d 36, 38 (1931), Division No. 2 of this Court said:

"The authorities are fairly harmonious in holding that, in order for a homicide to be reduced from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. It is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder are absent, and therefore the crime is not murder, but manslaughter. . . .

"In the case now before us, there is abundant testimony by disinterested witnesses to the effect that deceased made numerous threats against the life of the defendant. These threats were communicated to defendant. In addition, defendant testified that deceased followed defendant on two occasions within a few days prior to the homicide and threatened to assault him. Defendant testified he armed himself with a deadly weapon for the purpose of protecting himself against the threatened assaults of deceased; that at the time of the shooting deceased advanced toward him, stating 'I will get you now,' etc., and threw two rocks at defendant, and when deceased reached a point of about six feet from defendant, defendant shot to protect himself. After the shooting, defendant calmly walked by the body of the deceased and telephoned the sheriff that he had killed the deceased. Under this testimony there is no room for manslaughter. The killing of the deceased was not the result of a sudden provocation, calculated to excite the passion of defendant beyond control. If defendant is to be believed, he should be acquitted on the ground of self-defense. If defendant is not to be believed, then he is guilty of murder. . . . The court did not err in failing to instruct on manslaughter."

In 1969, in *State v. Smith*, 445 S.W.2d 326, 331 (Mo.1969), Division No. 1 of this Court cited the *Clough* language and held that, on the facts in the case, "the trial court likewise did not err in failing to instruct on the issue of manslaughter."

In 1971, in *State v. Ayers*, 470 S.W.2d 534, 538 (Mo. banc 1971), this Court en banc held that unless we can declare as a matter of law that there is " 'an entire absence of evidence upon which to rest a verdict of guilty of manslaughter,' " it is the duty of the trial court to give an instruction on manslaughter.

In 1972, in *State v. Hubbard*, 484 S.W.2d 224, 226 (Mo.1972), Division No. 1 of this Court cited the *Clough* language and held that "the trial court did not err in refusing to give the manslaughter instruction."

In 1972, in *State v. Patterson*, 484 S.W.2d 278, 280 (Mo.1972), Division No. 2 of this Court cited the *Clough* language and said:

"On this record, we hold that the trial court erred in failing to instruct on manslaughter because we cannot declare as a matter of law that the killing of Robert Russell was not the result of a 'sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control.' *State v. Clough*, supra; *State v. Ayers*, supra; and *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980, wherein the United States Supreme Court said:

" 'A judge may be entirely satisfied, from the whole evidence in the case, that the person doing the killing was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet, if there be any evidence fairly tending to bear upon the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter."

In 1973, in *State v. Jackson*, 496 S.W.2d 1, 4 (Mo. banc 1973), this Court en banc cited the *Clough* language and held, on the record in that case, that "the trial court did not err in failing to instruct on manslaughter because there is no evidence which would support a reduction of the homicide from murder to manslaughter."

In 1975, in *State v. Stapleton*, 518 S.W.2d 292, 299, 300 (Mo. banc 1975), this Court en banc referred to *Ayers*, in part, as follows:

". . . Affirmatively put, *Ayers* holds that when there is evidence sufficient to submit second degree murder, there is automatically evidence sufficient to submit manslaughter and that it is the function of the jury to decide whether the defendant acted with premeditation and malice.

. . . . .

"In short, the significance of *State v. Ayers*, supra, is the holding that the trial court is required to submit manslaughter in murder second degree cases on the basis of the evidence which supports the second degree murder instruction even though there is no evidence of lack of malice or premeditation—no evidence of provocation."

The writers of the principal, concurring and dissenting opinions in the Kansas City District of the Court of Appeals would seem to have agreed that, by use of the above language, *Stapleton* construed *Ayers* to require that, where conventional murder instructions are supported by the pleadings and evidence and are given, there must be an *automatic* submission of manslaughter. This requirement has been in effect since March 1, 1975 (See MAI–CR 6.02, Caveats). This requirement was not instituted by *Ayers*. Any contrary implication from the language appearing in *Stapleton* is unfortunate if "automatic" submissions were made prior to March 1, 1975.

As demonstrated above, in *Smith, Hubbard, Patterson* and *Jackson*, the *Clough* language has controlled. The significance of *Ayers* lies only in its emphasis on "the relative functions of judge and jury in a felonious homicide case," and in its holding that it is the *duty* of the judge to instruct on lesser grades of homicide unless he can declare, as a matter of law, that there is no evidence to support such submission.

Accordingly, we apply the *Clough* language to the facts of this case. The evidence at trial showed that George Chase, the deceased, came to the rescue of Kay Mohatt after her call for help. Chase grabbed appellant around the neck and was attempting to pull him away from Kay Mohatt and appellant called "get him off." Appellant's fellow escapee, Williams, then killed Chase with a mop bucket handle.

On this record, we declare, as a matter of law, that there is no evidence to support a submission of manslaughter under *Clough*.

## V.

### *Voluntariness of Appellant's Statements*

Appellant argues that the totality of the circumstances demonstrates that the statements given by him were involuntary. To support this conclusion, he points to the following factors: (1) that as an inmate of a mental institution, he is subject to special disability; (2) that he agreed to make a statement in order to get away from the hospital out of fear for his own safety; and (3) because there was undue delay in arraignment.

As to the first point, it must be noted that appellant was confined in Fulton State Hospital as a sexual psychopath, not because of any more generalized mental disability. Appellant made no defense in this case on the ground of a mental disease rendering him non-responsible for the criminal act, nor did he claim any inability to cooperate effectively with his counsel. Nor was there any effort to prove, at the hearing on the motion to suppress these statements, that appellant was mentally incapable of understanding the nature of the police investigation or the purport of his statements. No authority is cited for the proposition that a sexual psychopath is automatically incompetent to make an incriminating statement, and no good reason appears for establishing that as a general principle.

Nor do the facts support appellant's intimation that he submitted to promises or inducements of others. Even though and perhaps because he was suffering from his own self-generated fears, appellant himself instigated the idea of his being removed from the hospital and he himself took the lead in suggesting that he might make a statement if removed to the sheriff's office or to the police station. The record is completely empty of any evidence concerning a promise by any officer by way of inducement for him to make a statement, and appellant freely admitted that he was not subjected to any physical maltreatment. To cap it all, appellant did at no time commit himself to make a statement if he were removed from the hospital, and when he did finally make a statement it was at a time when he was already physically lodged at the police station.

■ With respect to the alleged delay in bringing appellant before a magistrate, a comparison of the time at which appellant was first accosted by the officers in the hospital and asked for a statement until the time that he was brought before the magistrate, shows that slightly over 20 hours expired. If it be assumed that this confrontation constituted an arrest and a holding in custody separate and apart from appellant's original commitment to Fulton State Hospital, then there would barely be a violation of Rule 21.14. However, the first two of appellant's three statements were made well within the 20-hour limit. In any event, a violation of the 20-hour rule does not as a matter of law render a confession involuntary. *State v. Menz*, 341 Mo. 74, 106 S.W.2d 440 (Mo.1937).

■ The trial court in this case held a hearing concerning the voluntariness of appellant's statements. The trial judge had the opportunity to see and hear the appellant so as to judge his competency and the trial court considered all the facts and circumstances now contended to show involuntariness. The trial court's ruling, not being clearly erroneous, will not be set aside. *State v. Garrett*, 510 S.W.2d 853, 855 (Mo. App.1974).

## VI.

### *Alleged Violation of Appellant's Constitutional Rights*

■ Appellant's contention concerning violation of his constitutional rights has several prongs. First, he contends that he did not sign a waiver of rights until after he had already made an oral statement to Bob Salmons in the presence of the police officers, and that the prosecution failed to show that the statement made to Salmons

was made pursuant to a knowing and intelligent waiver of the privilege against self-incrimination and of the right to counsel. In advancing this argument, appellant seeks to brush aside important evidence going to show that appellant did knowingly and voluntarily waive these rights. From the very first moment that the police officers met with appellant, they attempted to read a Miranda warning to him, but were interrupted in doing so by appellant himself. Furthermore, at that first meeting, appellant insisted that a tape recorder not be used, and that request was immediately honored. Still further, when requested to give a statement, appellant evidenced a knowledge of his right to be silent because he refused to make a statement and indicated that he would consider doing so only if he were removed from the hospital premises.

When the officers returned later that evening to take appellant from the hospital, they then again took out the Miranda card and did at that time complete a reading of the Miranda warning. Immediately after that, appellant took the initiative in asking for his friend, Bob Salmons, and when Salmons arrived appellant proceeded to loosen the flood gates of his memory without any urging from anyone. The trial court could fairly deduce from this sequence of events that appellant fully appreciated his constitutional rights to be silent, that he effectively used those rights as a lever to get himself removed from the hospital premises and to obtain the presence of his trusted friend, and that he then intelligently and understandingly decided to use his rights no further, but rather to make a clean breast of all the facts. *State v. Alewine*, 474 S.W.2d 848 (Mo.1971).

■ Appellant also complains that he asked for permission to contact a lawyer but that a hospital staff member refused to allow him to do so. This contention rests solely upon the testimony of appellant himself and is inconsistent with his declination to take advantage of later offers to permit him to consult with counsel if he desired to do so. It was well within the authority of the trial court to refuse to credit the testimony in question by the appellant.

■ Finally, appellant argues that when appellant declined to give a statement when first so requested at the hospital, that was an indication that he did not want to be questioned at all and the interrogation should then have ceased completely. The facts are not quite so simple. Appellant did not flatly refuse to answer questions, but rather he said that he would not do so at least until he was removed from the hospital premises. Once he was removed from the premises, his statement poured out voluntarily without even the necessity of the prod of questioning. The authorities cited by appellant with respect to this point are readily distinguishable.

The judgment is affirmed.

MORGAN, HOLMAN, HENLEY and FINCH, JJ., concur.

BARDGETT, J., concurs in separate concurring opinion filed.

SEILER, C. J., dissents in separate dissenting opinion filed.

BARDGETT, Judge (concurring).

I concur in the principal opinion and desire to state my reasons for so doing.

*State v. Ayers*, 470 S.W.2d 534 (Mo. banc 1971) was decided before this case was tried. The instant case was tried in May 1973 and was on a charge of murder in the first degree. The court gave a conventional first-degree-murder instruction but did not give a conventional second-degree-murder instruction nor a manslaughter instruction. Appellant complains of the refusal to give a manslaughter instruction.

In *State v. Johnson*, 505 S.W.2d 94 (Mo. 1974), the defendant was convicted of murder in the first degree under a conventional first-degree-murder instruction. The case was based upon circumstantial evidence.

On appeal the defendant complained of the failure of the court to give a conventional murder second-degree instruction. The point was sustained and the case reversed and remanded for new trial but in so doing the opinion said that, "This is not a case in which, under the evidence, the accused is guilty of murder in the first degree or is entitled to be acquitted. See, for example, *State v. Crow*, 486 S.W.2d 248 (Mo.1972); *State v. Terry*, 472 S.W.2d 426 (Mo. banc 1971)."

Thus, it is seen by *State v. Johnson, supra*, that at the time the instant case was tried, it was still the view of this court that it was not error to fail to instruct on murder second in direct-evidence cases if the case was of the *Crow* or *Terry* type.

*State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975), was a circumstantial-evidence second-degree-murder case in which the court did instruct on manslaughter. This court affirmed citing, inter alia, *State v. Johnson, supra*. *Stapleton* also discussed the role "provocation" plays in second-degree-murder cases and held that there need not be evidence of provocation in order to support an instruction on manslaughter.

In my opinion, *Johnson* and *Stapleton* stand for the proposition that in circumstantial-evidence-murder cases the trial court must submit on the lesser conventional homicide instructions.

In *State v. Clough*, 327 Mo. 700, 38 S.W.2d 36 (1931), *State v. Smith*, 445 S.W.2d 326 (Mo.1969), *State v. Hubbard*, 484 S.W.2d 224 (Mo.1972), *State v. Jackson*, 496 S.W.2d 1 (Mo. banc 1973), and *State v. Patterson*, 484 S.W.2d 278 (Mo.1972), the court decided the issue of whether it was error to refuse to give a manslaughter instruction in a second-degree-murder prosecution by considering whether there was evidence of a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. In my opinion, *Stapleton* held that the lack of evidence of provocation does not warrant a refusal to give a manslaughter instruction and to that

extent inferentially overruled holdings to the contrary in earlier cases and, therefore, I do not agree that *Clough* controls the issue of the manslaughter instruction in the instant case. *State v. Stapleton, supra*, at 299.

In my opinion, the decision in the instant case is controlled by *State v. Johnson, supra*. *Johnson* described the factual situation in which the court was required to give a lesser homicide instruction (murder in the second degree) and the situation described therein was a circumstantial-evidence case. *Stapleton* followed *Johnson* and was also a circumstantial-evidence case. The instant case is a direct-evidence case and is not specifically included within the holdings of *Johnson* or *Stapleton*.

I also do not believe the court should generally give retroactive effect to changes in the MAI–CR instructions and specifically would not do so here. To adopt a policy of giving retroactive effect to changes in instructions would seriously impede meritorious advancements in the procedural law of this state because of the predictable concern over invalidating convictions which were supported by the evidence, as this one is, under proper submission as of the time the case was tried.

I, therefore, concur.

SEILER, Chief Justice (dissenting).

I do not see how we can avoid holding it was error not to give the requested manslaughter instruction. When we announced the requirement that instructions must be given on second degree murder and manslaughter in all cases where the pleadings and evidence warrant submission of conventional first degree murder, it amounted to a declaration by this court that whenever there was evidence sufficient to submit conventional first degree murder there is also evidence sufficient to submit second degree murder and manslaughter and it is the function of the jury to decide whether the defendant acted with premeditation and malice: conventional first degree murder

involves an intentional killing with deliberation and premeditation; but a jury may disbelieve the evidence as to deliberation but believe it as to premeditation, thus finding second degree murder; or the jury may disbelieve the evidence both as to deliberation and premeditation, which under Sec. 559.070, RSMo 1969, still leaves manslaughter, assuming the homicide is not justifiable or excusable.

If we were correct in what we did, then the fact the present case was tried before March 1, 1975, is immaterial, because if first degree murder includes all that is necessary to prove a case of second degree murder or of manslaughter, depending on what the jury chooses to believe or disbelieve, that proposition does not depend on a particular date—it comes about because of what goes to make up first degree conventional murder. That did not change on March 1, 1975 or suddenly include something on that date it had never contained before. So there inevitably were facts present in the case before us on which the jury could have returned a verdict of manslaughter, it being conceded that the evidence "amply supported a charge of first degree murder." That being so, the requested manslaughter instruction should have been given and for the failure to do so the judgment should be reversed and the cause remanded.

If this is not so, then by insisting that in all conventional first degree murder cases there must also be instructions on conventional second degree murder and manslaughter, we would be helping convict defendants on second degree murder or manslaughter whether there was any evidence to warrant such submissions or not. I know that I for one had no such intention when I agreed to the requirement above mentioned. Therefore, I respectfully dissent.