**STATE of Missouri, Respondent,**

v.

**Carl Anthony TERRY, Appellant.**

**No. 55875.**

Supreme Court of Missouri,
En Banc.

Oct. 11, 1971.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Donald U. Beimdiek, Ira H. Sharp, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for defendant-appellant.

HENLEY, Judge.

Carl Anthony Terry, defendant, was indicted for the killing of Bernice Cunningham, and charged with first degree murder. Section 559.010.[1] A jury found him guilty of that charge and assessed his punishment at death. Section 559.030. Sentence was imposed in accordance with the verdict and he has appealed from the judgment. We affirm.

The evidence would support a finding by the jury that there was a party in the second floor three-room apartment of Bernice Cunningham in the City of St. Louis during the night of February 6, and the morning of February 7, 1969, attended by defendant, Miss Cunningham, Sanders Harris and JoAnn Murphy; that at about 9:30 a. m. on the 7th defendant shot Miss Murphy with a .38 caliber revolver and then immediately shot and killed both Mr. Harris and Miss Cunningham.

Defendant's stepfather testified that defendant told him later in the day of the shooting that he had just killed two people, and had shot a third and hoped she would die.

JoAnn Murphy testified that she, Mr. Harris and defendant were in the living room and Miss Cunningham was in the ad-joining bedroom when defendant started shooting; that she and Mr. Harris were sitting on a couch; that defendant shot her in the right side of her chest and then turned to Harris and inquired whether he would tell of this incident; that he then shot Harris who fell to the floor dead; that defendant made her walk with him into the bedroom where Miss Cunningham was asleep on the bed; that he walked around to a position behind Miss Cunningham, knelt on the bed, and put a shot through her head; that she (Murphy) ran to the window and jumped through it.

The testimony of police officers generally corroborated the testimony of Miss Murphy relative to the physical characteristics of the apartment and the location of the two bodies. Miss Murphy was found by the officers unconscious and prostrate on the front steps below the broken second floor window. A spent .38 caliber bullet was found in a pool of coagulated blood on the bed under the head of Miss Cunningham. Comparison tests demonstrated that this bullet was fired by a pistol found near a flight of stairs over which defendant fled when attempting to escape arresting officers some eight days after the shooting.

Defendant testified that he had been at Miss Cunningham's apartment that night but left before the shooting occurred; that all persons present at the party, including Miss Murphy, were using amphetamines.

Defendant contends that the evidence is not sufficient to sustain the conviction in that there was a failure to prove (1) deliberation, (2) mental capacity to commit murder, and (3) the death of Bernice Cunningham by gunshot wounds.

Deliberation is overwhelmingly demonstrated by the testimony of JoAnn Murphy that defendant walked into the bedroom to a position behind Miss Cunningham, knelt on the bed and put a bullet through her head. As to mental capacity to commit murder, there was no evidence

---

that defendant had a mental disease or defect excluding responsibility for his conduct. In the absence of such evidence the presumption is conclusive that he was free of mental disease or defect. See paragraph 7 of § 552.030. Defendant's contention that there was no proof of the death of Bernice Cunningham seems to be that there was no proof of a chain of custody of the body of the person identified by JoAnn Murphy as Bernice Cunningham from the latter's apartment to the hospital. The record refutes this contention. There is evidence of an unbroken chain of custody of the body of the person found by police lying on Miss Cunningham's bed from the moment it was taken from her apartment until it was delivered to the hospital, pronounced dead on arrival, and taken from there to the morgue. Furthermore, the body was identified by comparison of its fingerprints with those of Bernice Cunningham on file with the police department.

The next point briefed by defendant is in two parts. The first part is that " * * * the state failed to prove that the defendant had the capacity to understand the proceedings against him or to assist in his own defense." More specifically, defendant's point is that the state failed to make such proof because the written report of the psychiatric examination of defendant ordered by the court shows that the examination was not made by a "board-certified psychiatrist," but instead was made by three doctors of osteopathy not qualified to make psychiatric examinations; that therefore he did not receive a "psychiatric" examination as required by the statute (§ 552.020) ; that the report of examination was for that reason insufficient and did not constitute sufficient proof that he had the capacity to understand the proceedings against him and to assist in his defense.

■ The record does not support defendant's contention. The record shows that defendant was examined by a board-certified psychiatrist. Defendant filed a "Motion to set aside findings of psychia-

tric examination" shortly after the report required by § 552.020 was filed. Evidence was heard on this motion in which it was developed that one of the doctors participating in the examination was a board-certified psychiatrist. The motion was overruled. We do not reach or rule the question of whether the statute requires an examination by a board-certified psychiatrist.

■ The second part of the point is that "[t]he statutory scheme for determination of capacity to stand trial unconstitutionally discriminates against the poor and violates the right to equal protection of the law." In other words, defendant says that he was denied equal protection in that because of his poverty he could not have an examination by a private board-certified physician of his own choosing as authorized by § 552.020(4), whereas persons able to pay the expense of such examination may have the benefit of the testimony of a private physician.

A little over a month after the examination ordered by the court had been made and the report filed, defendant moved for another examination, one by a physician of his choice at state expense. The motion was overruled. This is the basis for his contention that he was denied the right of equal protection.

The contention is closely analogous to that made in State ex rel. Hoover v. Bloom, Mo., 461 S.W.2d 841. In that case an inmate in a state mental institution applying for release on the ground that he was now sane, sought an examination by a physician of his own choice contending he was entitled to the examination at state expense. The contention was rejected. In that case we recognized the need for a disinterested physician to examine the inmate, where the director of the institution in which the petitioner was confined was opposed to release. The cases concerning the alleged equal protection violation involved in making possible an examination by a physician of the petitioner's own choice for moneyed inmates but not for indigents

were reviewed, and we did not find a constitutionally impermissible discrimination. We do not find one here. Moreover, the motion was not timely filed. See paragraph 4 of § 552.020. It is also noted that there is no cause to doubt the objectivity of the examining physicians in this case. Unlike the Hoover case, supra, the custody of defendant was only for purposes of the psychiatric examination ordered by the court, so that the element of interest, the vindication of a personal administrative decision, does not exist here. Defendant was not denied equal protection of the law.

■ Defendant next contends that the court erred in failing to grant a mistrial at the close of the opening statement by counsel for the state. In his opening statement, counsel related, in general, the evidence that would be presented by the state. Near the close of the statement counsel said: "[t]hat, in effect, will be what the State's evidence will show after which time the defendant will be free to offer any evidence he chooses; after which time I will return  * * *." Defendant contends that this statement was an unfair comment on his right to remain silent, that it violated his right against self-incrimination, and improperly led the jury to believe that he had the burden of proving his innocence. The only authority he cites in support of his contention is the federal and state constitutional provisions against self-incrimination, the statute (§ 546.270) prohibiting reference to an accused's failure to testify, and State v. Thompson, Mo., 425 S.W.2d 80, holding that argument that a defendant had the right to introduce any evidence he had was not a comment on his failure to testify.

The remark, coming as it did in the opening statement, could hardly be said to be a comment on failure to testify or on his right to remain silent. Defendant does not explain in argument his bald assertion that the state's remark led the jury to believe he had the burden of proving his innocence. We find no support for this assertion. The remark appears to be no more than a brief statement of the order in which the trial would proceed. The trial court, in its discretion, apparently so considered it. The court did not err, nor did it abuse its discretion, in denying the motion for a mistrial.

■ Defendant's next point is that the court erred in permitting JoAnn Murphy to testify that immediately before Sanders Harris was shot he " * * * was pleading for his life." Defendant objected to this testimony on the ground it was hearsay and the objection was overruled. The ruling of the court was proper. Miss Murphy did not state what Sanders Harris had said. The question and answer were:

"Q. Was anything said prior to the time that Carl Terry shot Sanders Harris in the head?

"A. He was pleading for his life."

The statement is a part of the description of the circumstances and conditions at the scene of the multiple killing and was admissible as part of the res gestae. State v. Sarkis, Mo., 313 S.W.2d 723, 726; State v. Cruts, 288 Mo. 107, 231 S.W. 602, 605–606[3].

■ Defendant's next contention is that the court erred in not permitting his counsel in argument to draw an unfavorable inference from the fact that there was no evidence that fingerprints of the defendant were taken from the alleged murder weapon. Essentially the same contention was made in State v. Holmes, Mo., 389 S.W.2d 30, 34. The court held in the Holmes case that a defendant could not in argument draw an unfavorable inference from the state's failure to take fingerprints from articles touched by him, because it is not incumbent on the state to take fingerprints.

■ Defendant assigns as error the court's refusal to grant him a continuance for the purpose of securing the attendance of a witness, one Ernest Battle. No timely oral or written motion for a continuance stating sufficient grounds therefor and

what the witness would testify was made. At the close of the state's case there was a colloquy between counsel and the court in which defense counsel stated a subpoena had been issued for this witness and that he desired to present his testimony before defendant's testimony, but that the subpoena had not been served. Counsel acknowledged that defendant had been granted a continuance and the case reset on one prior occasion, because this witness could not be found and the subpoena served. The court indicated that it would not permit delay of the trial beyond the next morning and defendant proceeded to testify. The trial went into the next day and the witness did not appear, the officers, with the help of others, being unable to find him for service of the subpoena.

The court did not err in refusing to grant the continuance. The request for a continuance was not timely made, did not state sufficient grounds, and did not show that the witness had material testimony to give. State v. Ash, Mo., 286 S.W.2d 808; State v. Scott, Mo., 338 S.W.2d 873, 876.

■ Defendant claims also that the court erred in denying his supplemental motion for new trial based on the ground that he had newly discovered evidence. The evidence was to be the testimony of Homer Gaines, who had previously taken the stand in the case and refused, on the advice of his attorney, to answer any questions on grounds of possible self-incrimination. The motion was supported by the affidavit of Mr. Gaines stating that the charges previously pending against him had been brought to a conclusion, and he was now willing to testify; that his testimony would be that he went to Bernice Cunningham's apartment on February 7, at about 12:30 a. m.; that JoAnn Murphy was using drugs at the apartment contrary to her testimony at the trial, and that he observed no fights or disputes and heard no shots while he was in the Cunningham apartment. The evidence this witness would provide does not satisfy the require-

ments for newly discovered evidence. Evidence which is merely cumulative, corroborating, and impeaching, and not likely to bring about a different result, is not sufficient to require that a new trial be granted. State v. Pinkerman, Mo., 349 S.W.2d 951, 953[4–6]; State v. Boykins, Mo., 434 S.W.2d 484, 486[3, 4]. This evidence is obviously impeaching evidence, and, of course, was cumulative and corroborative of defendant's own testimony. The trial court did not err in refusing to grant a new trial on these grounds.

Defendant contends the court erred in refusing to give an instruction on second degree murder, because " * * * the jury could have concluded * * * there was no deliberation." The only expressed defense was alibi, but we infer from the reference to deliberation in his argument that he is contending "there was no deliberation" because he had a mental disease or defect and, therefore, was incapable of deliberation. However, there was no evidence of a mental disease or defect.

■ The state's evidence points only to guilt of first degree murder. Defendant's evidence is that he was somewhere other than Miss Cunningham's apartment at the time she was murdered. The only submissible issue of guilt was first degree murder. State v. Stidham, Mo., 305 S.W.2d 7; State v. Barbata, 336 Mo. 362, 80 S.W.2d 865. The court did not err in refusing to give an instruction on second degree murder.

■ Defendant next contends that his death sentence cannot be carried out, because the jury which imposed it was chosen by excluding veniremen for cause on the ground they had general objections to the death penalty or had conscientious or religious scruples against it. He cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L. Ed.2d 221, which hold that a defendant cannot constitutionally be put to death as a result of a verdict of a jury so chosen.

See also Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433.

In discussing what can and what cannot be expected of a prospective juror, the court, in Maxwell v. Bishop, 398 U.S. at 265–266, 90 S.Ct. at 1581, quoted part of a footnote in *Witherspoon* (391 U.S. at 522, fn. 21, 88 S.Ct. 1770), as follows: "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out * * *." See also: State v. Coleman, Mo., 460 S.W.2d 719, 727; Duisen v. State, Mo., 441 S.W.2d 688.

The record does not support defendant's contention. Counsel for the state examined each venireman individually as to the death penalty. Eighteen were challenged for cause and excused as a result of this examination. We will not further lengthen this opinion by quoting the record of the examination of those eighteen veniremen. We have carefully reviewed the record and find that none were excluded upon grounds held impermissible in the Witherspoon case. The substance of the examination of all prospective jurors is typified by the examination of venireman Bateman, the first member of the panel challenged for cause. We quote that examination:

"MR. FRIEDMAN: Mr. Bateman, I would like to ask you similar questions. Do you have any conscientious or religious scruples that would prevent you from considering the death penalty?

"MR. BATEMAN (#19): I don't believe in capital penalty.

"MR. FRIEDMAN: The fact that you don't believe in capital punishment, would

that prevent you from considering the death penalty?

"MR. BATEMAN: It would.

"MR. FRIEDMAN: It would. In that case I would like the Court to note that.

"THE COURT: You may not be in favor of the death penalty, but the Court will —may instruct you that the punishment for Murder First, if the case is proved beyond a reasonable doubt, is either death or life. Now, there are some people who under no circumstances or condition regardless because of their belief would ever assess the death penalty. That is the position, that is one thing, but you may not have a belief in the death penalty but you may be able to consider it, if the Court would so instruct it is authorized by law. Now, with that short explanation, I take it, sir, that you would not consider it in any event?

"MR. BATEMAN: No.

"THE COURT: All right. I want to clear this up. A person could be against the death penalty, and yet it is a lawful— under the law an authorized penalty that can be assessed in a particular case; then they should set their personal beliefs aside and consider it. I just want to make that clear because this question is going to come up as we go along. And you couldn't consider it under any circumstances?

"MR. BATEMAN: No, sir."

The record demonstrates that those veniremen excused from the panel from which the trial jury was selected were excused because they would not consider the death penalty regardless of the facts and circumstances of the case.

Defendant contends that the death sentence cannot be carried out, because (1) the jury was given no standard or direction to guide it in determining whether to assess punishment at death or imprisonment for life, and (2) the issues of guilt and punishment were determined in a single trial. He also contends that the sentence cannot be carried out because his sin-

gle-verdict trial required by Missouri law[2] compelled him to testify at the risk of damaging his case on the issue of guilt if he were to exercise his right to testify on the issue of punishment. He asserts that for these reasons he was denied rights guaranteed him by Article I, § 10, Constitution of Missouri, V.A.M.S. and the Fifth and Fourteenth Amendments to the Constitution of the United States.

 The contention that a death sentence imposed by a jury not given standards and directions to follow in making its decision between one punishment or the other could not be enforced was raised and considered in Duisen v. State, 441 S.W.2d 688, 692. We held that entrusting this decision to a jury without standards or directions for their guidance did not violate an accused's state or federal constitutional rights. In May, 1971, a few days before this case was argued, the Supreme Court of the United States reached the same decision in the companion cases of McGautha v. California and Crampton v. Ohio, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711.

The contentions that the resolution of the issues of guilt and punishment in a single-verdict trial and that such a trial compelled an accused to testify on the issue of punishment at the risk of damaging his case on the issue of guilt were also raised in the Crampton case, supra, and were ruled adversely to defendant's position in this case.

Defendant's last point is that the death sentence cannot be carried out, because the infliction of death is cruel and unusual punishment prohibited by Article I, § 21, Constitution of Missouri and the Eighth Amendment to the Constitution of the United States. This same point was considered and ruled in Duisen v. State, supra, at 693 of 441 S.W.2d, contrary to defendant's position, and defendant has

presented no reason why we should reconsider that decision. We perceive none.

The judgment is affirmed.

All concur.

---

2. Section 546.410, RSMo 1969, V.A.M.S.