STATE of Missouri, Respondent,

v.

Eric Adam SCHNEIDER, Appellant.

No. 67941.

Supreme Court of Missouri,
En Banc.

Sept. 15, 1987.

Rehearing Denied Oct. 13, 1987.

**394**

Kathleen M. Markie, Columbia, Mo., for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, John M. Morris, Asst. Attys. Gen., Jefferson City, Mo., for respondent.

RENDLEN, Judge.

Defendant appeals from his conviction on two counts of First Degree Murder, Section 565.020, RSMo 1986, for which he was sentenced to death.[1] The cause falls within this Court's exclusive appellate jurisdiction. Mo. Const. art. V, Sec. 3. We affirm.

In his numerous points on appeal defendant presents no general challenge to the sufficiency of the evidence and we detail only those facts necessary to and supportive of the verdict which the jury reasonably could have found from the evidence. On the afternoon of January 7, 1985, defendant and two friends, David Morgan and Charles Palmer, went to the home of Rolland Johnson. While there defendant commented he "needed a better job," that his girlfriend was not well paid and he "had to do a job or rob somebody." Johnson noted that defendant had his personal weapon, a sawed-off .22 caliber rifle nicknamed "Baby," and Palmer was carrying a sawed-off shotgun.

On Friday, January 11, defendant and Morgan returned to Johnson's house where defendant borrowed twenty dollars, stating he was "planning something" and would repay Johnson Sunday. The following afternoon defendant, Morgan, and Palmer were seen leaving defendant and Palmer's south St. Louis apartment at 2246A Jules Avenue in defendant's car. During the same afternoon the victims entertained visitors at their secluded home in House Springs until approximately 7:30 P.M., which was the last time they were seen alive. Sometime after 10:30 that night, defendant, Palmer, and Morgan returned to the Jules Avenue apartment with a number of items of personal property, including a safe, video cassette recorder, microwave oven, jewelry, men's watches, antique

---

1. All statutory references are to Missouri Revised Statutes, 1986, unless otherwise indicated.

clock, camera and movie projector. Palmer arrived at the residence in a car later identified as belonging to one of the victims. While unloading the cars, defendant handed a knife to Tom Herrick covered with something resembling light brown paint which he asked Herrick to clean. Later defendant divided the stolen goods, which he displayed to several people, including Patricia Woodside, who agreed to purchase the video cassette recorder. While being shown around defendant's apartment she commented that he had "made a killing." Defendant, who was "playing" with a knife, laughed and replied, "Yes. A couple of them." Somewhat later Palmer left for California in the victim's car.

On Sunday morning, January 13, defendant and Morgan discussed the events of the previous evening with Patrick Schaffer, a friend of Tom Herrick. Morgan bragged that he had kicked in the door to the victims' residence "like Clint Eastwood" and defendant described how the victims were taken to the basement and bound. When the "fat guy" "got tough," defendant shot him in the back. Defendant "smirked" and laughed as he described later shooting the "fat guy" in the head and mimicked the "funny face" the victim made. He explained that Morgan was supposed to hold the other victim while Palmer cut his throat, but Morgan was unwilling to participate so Palmer "did the job" himself. Defendant and Palmer then went upstairs and Morgan stayed to watch the victims. Morgan apparently wandered away and when he returned the victim whose neck had been cut was missing. Morgan "yelled for" the defendant, who came downstairs, and they found the victim staggering on the pool side patio and saw him fall into the pool.

Later that day, defendant repaid Johnson the twenty dollars and told how he had robbed a couple of "faggots" after kicking in their door as they were about to have dinner. Defendant said that one of the victims "kept rattling off with his mouth,"

so defendant "stomped" him "with his boots" in the back and head. After breakfast, defendant Morgan, and Johnson drove to defendant's apartment, but had a flat tire en route. As they were changing the tire, a patrolman stopped, admonishing them to be careful of the traffic, and during this encounter the officer observed a brown box through the open car door which Morgan, who was visibly nervous, attempted to hide. The box was found to contain jewelry and a short time later defendant, Morgan, and Johnson were arrested.[2]

One of the officers who had questioned Morgan went to the victims' home and found it had been ransacked. The body of Richard Schwendemann was discovered in the basement and that of Ronald Thompson in the swimming pool. Schwendemann's hands and feet were bound with cords, wires, and a string of Christmas lights and a dog chain was around his neck. He had been shot in the back and the forehead and had two broken ribs. Thompson, who also was bound, suffered 15 stab wounds to the neck, scalp, chest, side and back. Ballistics evidence indicated the shots that killed Schwendemann were fired from defendant's .22 caliber rifle and it was established that the knife defendant had given Herrick to clean bore traces of blood. Subsequent investigation connected defendant, Morgan, and Palmer with the articles and property missing from the victims' house. Palmer was apprehended in California with the victims' credit cards in his possession.

Defendant was charged with and convicted of two counts of first degree murder, first degree robbery, first degree burglary and two counts of armed criminal action. He was sentenced to death for the murders.

■ We first determine whether the court erred during the penalty phase of trial in prohibiting defendant from introducing evidence pertaining to the plea agreement between codefendant Morgan

---

2. Defendant does not challenge his arrest. At a pretrial hearing it was revealed that defendant's car matched the description of the "getaway" vehicle used in a January 7, 1985 robbery of a dentist's office in the St. Louis area. Morgan apparently resembled a composite of one of the perpetrators of that robbery. After the arrest, Morgan confessed to the homicides.

and the State. Under the terms of that agreement Morgan was to plead guilty to two counts of felony murder and "testify truthfully" if called as a witness. In exchange the State agreed to recommend that Morgan be sentenced to concurrent thirty-year terms of imprisonment on the felony murder counts and enter orders of *nolle prosequi* to other charges against him, including "two counts of capital murder."

Morgan was endorsed as a witness by both the State and defendant; however, the State announced, prior to defendant's trial, that it did not intend to have Morgan testify and filed a motion *in limine* to prohibit any reference to Morgan's plea agreement. The motion was sustained on the condition that the State not call Morgan as a witness, and in fact Morgan testified at neither the guilt nor the penalty stage of defendant's trial. Nonetheless defendant attempted to introduce evidence of the plea agreement as a "mitigating circumstance" during the punishment phase. The offer of proof was denied and it was ordered that neither side mention the disposition of the codefendant's case. It is this ruling which defendant contends deprived him of the opportunity to present relevant mitigating evidence in contravention of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1976) and subsequent cases.

In *Lockett* the Supreme Court concluded that an Ohio death penalty statute which did not permit consideration of mitigating circumstances other than the three it specifically enumerated was incompatible with the commands of the Eighth and Fourteenth Amendments because those Amendments "require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a *mitigating factor*, any aspect of a *defendant's character or record* (emphasis added) and any of the *circumstances of the offense* (emphasis added) that the defendant proffers as a basis for a sentence less than death." *Lockett*, 98 S.Ct. at 2964–65 (footnotes omitted). The Court noted, however, that "[n]othing in this opinion limits the traditional authority of a court to exclude, *as irrelevant, evidence not bearing on the defendant's character, prior record, or*

*the circumstances of his offense.*" 98 S.Ct. at 2965 n. 12 (emphasis added). In *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Court, after quoting *Lockett*, stated: "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any *relevant* mitigating evidence.'" *Id.* 106 S.Ct. at 1671 (emphasis added). However, in his opinion concurring in the judgment Justice Powell noted that:

> the States, and not this Court, retain "the traditional authority" to determine what particular evidence within the broad categories described in *Lockett* and *Eddings* [*v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1985)] is relevant in the first instance. As long as those determinations are reasonable—as long as they do not foreclose consideration of factors that may tend to reduce the defendant's culpability for his crime, this Court should respect them.

*Id.* at 1674 (citations omitted).

Thus, although it is "desirable for the jury to have as much information before it as possible when it makes the sentencing decision," *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976), evidence introduced in mitigation must be relevant to "the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 98 S.Ct. at 2965 n. 12.

This limitation on the broad range of factors to be considered in mitigation is reflected in Section 565.032(3), which provides that the jury shall consider, in addition to the factors specified in the statute,

> [a]ny mitigating or aggravating circumstances *otherwise authorized by law* and supported by the evidence and requested by a party including any aspect of the *defendant's character*, the *record of any prior criminal convictions*, and pleas and findings of guilty and admissions of guilt of any crime or pleas of nolo contendere *of the defendant* [.]

(Emphasis added.)

The question then, under the Missouri murder statute as well as the Eighth and

Fourteenth Amendments, is whether the evidence pertaining to Morgan's plea agreement was relevant to the determination of defendant's sentence. It is well settled that the trial court has broad discretion on questions of relevancy and its decision should be disturbed only if it has abused that discretion, *State v. Blair*, 638 S.W.2d 739, 757 (Mo. banc 1982); *see also State v. Malone*, 694 S.W.2d 723, 727 (Mo. banc 1985), and we do not believe there was such an abuse in this case.

Defendant makes only a vague and conclusory argument that Morgan's plea agreement was relevant as a mitigating factor. The agreement certainly did not pertain to *defendant's* character or prior record, and while Morgan's activities in the crime were relevant to the "circumstances of the offense," the bargain he struck with the prosecutor subsequent to the murders was not.

We do not, of course, indicate a defendant may be unduly restricted in arguing the minor nature of his participation in the crime, which is among the enumerated statutory mitigating factors, Section 565.032.-3(4), and while the disposition of a codefendant's case normally is not competent evidence, it may be appropriate for the purpose of impeachment on cross-examination. *See State v. Gilmore*, 681 S.W.2d 934, 945 (Mo. banc 1984). Thus if a codefendant testifies to the crime, evidence of a plea agreement might be relevant to the credibility of the codefendant's version of the "circumstances of the offense"; however, here Morgan did not testify nor was his credibility in issue.

Defendant's contention is in essence a thinly veiled assertion that the jury may conduct a proportionality review if presented with evidence pertaining to the punishment expected by defendant's cohorts. This argument is flawed by its assumption that the jury may properly engage in a proportionality review which takes into con-sideration sentences awarded other defendants. The Missouri murder statute makes no provision for such review by the jury; instead it charges this Court with the responsibility of ascertaining whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases...." Section 565.035.3(3). The jury is to be "guided and channeled by a system that focuses on the circumstances of each *individual homicide* and *individual defendant* in deciding whether the death penalty is to be imposed." *State v. Shaw*, 636 S.W.2d 667, 675 (Mo. banc 1982) (quoting *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976)). Consideration of extraneous facts unconnected to the individual defendant and his offense would not be consistent with the jury's duty under the Missouri murder statute.

An additional infirmity in defendant's argument is its underlying theme that proportionality review should include cases in which a codefendant had at some point been charged or chargeable with a capital offense. We do not, in conducting our review, compare cases

> in which the state chose not to charge a defendant with capital murder, the state agreed to a plea bargain whereby a defendant pled guilty to a lesser charge, the conviction was for an offense less than capital murder, or the state waived the death penalty.

*State v. Bolder*, 635 S.W.2d 673, 685 (Mo. banc 1982). As was noted by Justice White in *Gregg*, "[i]f the cases were truly 'similar' in relevant respects it is unlikely that prosecutors would fail to prosecute them as capital cases...." 96 S.Ct. at 2949 (concurring opinion). We, like Justice White, are "unwilling to assume the contrary." *Id.*[3] Clearly the trial court did not abuse its discretion in excluding evidence of the plea agreement, and defendant's point is denied.[4]

---

3. It has been well said that prosecutorial discretion does not render a statutory scheme for charging, convicting, and sentencing defendants in capital cases "standardless" and therefore unconstitutional. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976) (concurring opinion of Justice White).

4. Defendant's reliance on *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1985) is misplaced.

■ We next address defendant's contention that he was denied due process of law as a result of "prosecutorial misconduct" during closing argument in both stages of his trial. Although couched in terms of "prosecutorial misconduct," defendant's complaint focuses upon comments made by the state during closing arguments which defendant contends indicated that he personally stabbed Ronald Thompson.[5] He argues that those comments were made in bad faith because "the prosecutor was aware at that time of the sworn deposition of David Morgan ... stating that Charles Palmer alone stabbed Thompson."

No objections to the challenged portions of the arguments were lodged at the time they were made, instead defendant asserted this challenge for the first time in his motion for new trial, which the court denied. It has long been established that "[c]omplaints concerning the substance of closing argument call for immediate objection so that corrections may be made and appropriate cautionary instructions given.

In *Eddings* the Court held that the trial court's apparent refusal to consider, as a matter of law, the youthful defendant's troubled background and family history in sentencing him to death was inconsistent with the principles espoused in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1976). In *Skipper* the trial court did not admit evidence pertaining to defendant's behavior while in prison. Thus in both cases the excluded evidence pertained to *defendant's* character and record. The same cannot be said in the case at bar.

Defendant also notes that evidence of a codefendant's plea bargain was admitted during the sentencing stage in *State v. Gilmore,* 681 S.W.2d 934 (Mo. banc 1984). While this Court noted that such evidence was presented to the jury, it indicated neither approval nor disapproval of the decision to admit it, and that ruling by the trial court was not challenged or at issue on appeal. In any case, we point out once again the broad discretion with which the trial court is vested in determinations of relevancy.

5. The challenged argument, made during the guilt phase, was as follows:
   David Morgan comes downstairs and, according to Patrick, as soon as David finds he's gone yells out for who? He yells out for Eric.
   He goes, "Eric, he's gone." Why does he yell for Eric? Because Eric is in control of everything. He's in charge.
   And then, Eric goes out and they find Mr. Thompson out by the pool and he takes, ladies

An objection made after the close of argument comes too late." *State v. Stuckey,* 680 S.W.2d 931, 937 (Mo. banc 1984). Thus defendant failed to preserve any contention of error pertaining to the challenged portions of the prosecutor's arguments.

■ We do not believe the arguments in this case were "so noticeably improper or prejudicial as to warrant a mistrial *sua sponte* by the trial court." *State v. Morgan,* 645 S.W.2d 134, 137 (Mo.App.1982). Defendant concedes that "it was possible" for the conclusion made by the prosecutor "to be inferred from the evidence," and we note that the trial court has broad discretion in controlling the arguments of counsel. *State v. Shaw,* 636 S.W.2d 667, 675 (Mo. banc 1982). Because the arguments expressed inferences reasonably drawn from the evidence we are unwilling to conclude that the prosecutor acted in bad faith.[6] We find no abuse of discretion here, and *a fortiori* no plain error. The point is denied.

and gentlemen, this particular knife and he's finished off at the pool.
   That's the only way the murder could have happened. It would have been impossible for just the one wound—with all of those wounds for him to have been able to get out of the house, climb out that window and get out to the pool.
   During the punishment phase, the state argued:
   He's caught by the pool where he's finished off. And the manner in which he's finished off—I mean, it's just not, you know, one stab wound or another shot but multiple stabbings, 15 stab wounds to the chest or to the torso, one after another. One stab after another.
   What kind of person can do that? What kind of person can take an individual whose neck had already been cut open, who is completely defenseless, and just continually stab him, running his knife into their chest?
   The person that can do that, ladies and gentlemen, is the Defendant in this case, Eric Schneider.

6. As defendant concedes, there was circumstantial evidence indicating that he stabbed Thompson. Defendant places much reliance on the deposition of David Morgan in arguing that there was direct evidence indicating that Palmer, not defendant, stabbed Thompson. However, neither defendant nor the state introduced Morgan's deposition into evidence.

Defendant also posits error in the trial court's denial of his motion to suppress certain evidence seized from and photographs taken at the 2246A Jules Avenue residence where defendant periodically lived.

Acting on information supplied by David Morgan, police officers obtained a warrant for the search of the Jules Avenue residence, listing as items to be seized a cream colored combination safe, a .22 caliber sawed-off rifle, .12 gauge sawed-off shotgun, Canon movie projector, Canon movie camera, orange leather jewelry case and "any other items related to the crime." Morgan had mentioned other evidence which the police felt was not "sufficiently described" to be listed in the warrant.

Morgan accompanied the officers when they executed the warrant and while going from room to room pointed to things readily visible during the walk-through that had been stolen from the victims' home. Each room contained at least one of the items specifically named in the warrant, and photographs were taken depicting the condition of the Jules residence at the time of the search and the location of all the evidence seized.

██ While defendant contends the search exceeded the warrant's scope, the State correctly argues that the property was seized under the plain view doctrine, an exception to the warrant requirement which applies when: (1) the evidence is observed in plain view while the officer is in a place where he has a right to be; (2) the discovery of the evidence is inadvertent; and (3) it is apparent to the police that they have evidence before them. *State v. Clark*, 592 S.W.2d 709, 715 (Mo. banc 1979); *State v. Collett*, 542 S.W.2d 783, 786 (Mo. banc 1976). Neither the validity of the search warrant nor the officers' presence at the scene are contested, and the testimony and photographs indicate the items seized were in open view. Thus it appears the first requirement for application of the plain view doctrine is met. Defendant vigorously contests, however, the State's claim that the second and third requirements are also satisfied.

Although defendant focuses on the innocuous nature of the seized goods, it stretches credulity to argue that the stolen items identified by Morgan did not have evidentiary value readily apparent to the police. Morgan's connection of those items to the robbery and murders amply satisfies the second requirement of the tripartite test.

The third requirement, pertaining to the inadvertence of the discovery, was analyzed in *Clark*, where we stated that the term "inadvertent" is used in the sense of "unintentional" rather than "unanticipated" and quoted with approval the following passage from *United States v. Hare*, 589 F.2d 1291, 1294 (6th Cir.1979):

We conclude, then, that "inadvertence" in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observed it in the course of an otherwise-justified search. There are many times when a police officer may "expect" to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances exist, and no warrant could have been obtained before the discovery.

592 S.W.2d at 715. While the police in this case may have expected to find evidence beyond that listed in the warrant, that expectation was vague and general until the stolen goods were observed and identified by Morgan. The officers' discovery of the evidence defendant sought to exclude was "inadvertent" as the term was defined in *Clark*, and the trial court did not err in overruling defendant's objection.

██ Defendant next asserts the court erred in denying his request for a mistrial after "the prosecutor intentionally elicited

a response from state's witness Pat Woodside indicating that [defendant] had threatened her by telephone." The court had previously granted defendant's motion *in limine* to exclude references to threats defendant made to Woodside.

During direct examination Woodside testified, without objection, that she agreed to purchase the video cassette recorder stolen from the victims' home and that she was to pay defendant $100 when she received her paycheck on the next Friday. She stated that:

A The Defendant said—he said it's a hundred dollars. He says, "I know where you live and I know where you work." He said, "So, don't try and screw me out of my money." And he had mentioned—threatened me with a name.

Q What did he say?

A He said, "Do you know a man by the name of Steve Goode?" And I said, "Yes." And he said, "Don't make me come and look for you for the money."

The following exchange, to which defendant also posed no objection, occurred later during direct examination:

Q Now, when the following Friday rolled around did you pay the Defendant?

A No, I did not.

Q Did you ever receive any call from him?

A I did.

Q What happened during that call?

A I was at work and I received a phone call from Eric himself and Eric—I had read the newspaper articles where they were holding an Eric Schneider from Jules Avenue with possession of stolen merchandise and with two murders in the House Springs.

Eric called and stated that he was in jail that all the police had on him was possession of stolen merchandise and that he needed some money because he was sitting in jail with no cigarettes and no money in the books and he wanted his money that I owed him for the merchandise.

The following testimony, to which defendant objects, occurred during redirect:

Q All right. Thank you. Why didn't you return the items that you had in your apartment after you had learned that they may have been involved in a double murder?

A I received a threatening phone call at work.

Q Is that the phone call that you previously described to us?

A Yes.

Q From Mr. Schneider?

A It is.

[DEFENSE COUNSEL]: Judge, may we approach the bench?

(The following proceedings were had at sidebar out of the hearing of the jury:)

[DEFENSE COUNSEL]: We just got into the area we weren't going to get into in the motion in limine.

THE COURT: Let's stay away from it.

[PROSECUTOR]: I would like to—

THE COURT: You know better than getting into something like that except at sidebar.

[PROSECUTOR]: I didn't mean to try to get into it. At that time I was asking her for the reason and that's what she came up with and I hadn't talked to her or anything.

Initially we observe that it is not at all clear the witness's reference to threats was a response anticipated by the prosecutor, much less one "intentionally elicited." Furthermore, assuming *arguendo* that the testimony was elicited in violation of the court's order on the motion *in limine*, defendant was not prejudiced by the testimony to such an extent that the court had no choice but to grant a mistrial.

After defense counsel posed his objection he informed the court that he did not want the jury cautioned "for fear it would accent" the testimony; he instead moved for a mistrial. "The declaration of a mistrial is a drastic remedy that should be employed only in extraordinary circumstances in which prejudice to the defendant can be removed in no other way." *State v. Davis,* 653 S.W.2d 167, 176 (Mo. banc 1983). The

decision whether to declare a mistrial rests largely within the discretion of the trial court because "the trial court observes the incident that precipitates the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident has on the jury." *Id.* The trial court's determination on the necessity of a mistrial will not be disturbed in the absence of an abuse of discretion, *id.* and we find no such abuse here. In light of the detailed evidence pertaining to defendant's conversations with Woodside regarding payment for the video cassette recorder, which we noted previously, the additional testimony and the witness's brief and general reference to a "threatening phone call at work" was not such as to require a mistrial. Any error in failing to take less drastic curative measures was invited by defense counsel's rejection of other relief. *State v. Gilmore,* 681 S.W.2d 934, 943 (Mo. banc 1984). "The fact that defendant sought no relief other than a mistrial cannot aid him." *Id.* Defendant's contention is denied.

Defendant next challenges the trial court's ruling limiting his cross-examination of Pat Woodside about "threats or promises or details supplied [to her] by the police." The question defense counsel posed to Woodside, to which the State immediately objected, was: "All right. They told you that David Morgan implicated Eric Schneider, didn't they?" The court sustained the objection, apparently on the basis of hearsay, and noted: "You can bring the police officers in and have them testify as to what they told her." The defendant argues that the testimony would not have been hearsay because it was "not offered for the truth of the matters asserted therein," but rather was relevant to Woodside's credibility.

■ It should first be noted that defendant failed to preserve his objection. After discussion at the bench, the following exchange ensued:

THE COURT: I've got to hear what all you're going to ask her. We'll go back in chambers and you can outline everything you're going to ask her.

[DEFENSE COUNSEL]: Judge, I would like to proceed with the rest of my cross.

THE COURT: Okay. We'll get back to this if I permit it.

[DEFENSE COUNSEL]: Right.

When an objection to proffered evidence is sustained, the proponent of the evidence must make an offer of proof in order to preserve the matter for appellate review, *State v. Dixon,* 655 S.W.2d 547, 557 (Mo. App.1983), and this defendant failed to do.

■ Furthermore, assuming *arguendo* that the court's ruling was incorrect, defendant has failed to demonstrate prejudice. Much of the evidence he apparently sought to adduce through the prohibited question was admitted at other points in Woodside's testimony, although not in detail. She testified that the police told her about evidence that they had gathered in the case, and she also testified that she was not threatened by the police in any way. Therefore "the jury received the gist of the testimony defense counsel attempted to develop" and "the court's rulings were not prejudicial to the defendant." *Gilmore,* 681 S.W.2d at 940.

■ Defendant also contends that the trial court erred in prohibiting him from cross-examining police officer Jan Vessell and criminalist Roger Corcoran "as to their failure to gather evidence of dog hair, human hair, fiber or soil samples from either [defendant] or the scene of the crime, or to perform atomic absorption tests to determine whether [defendant] had recently fired a handgun." He argues such evidence was relevant to demonstrate bad faith and bias on the part of police officials.

A nearly identical contention was rejected in *State v. Simpson,* 611 S.W.2d 556 (Mo.App.1981). There the court stated:

... defendant argues it was error to preclude his counsel from arguing to the jury that the lack of fingerprint and hair sample evidence implied or indicated the police framed defendant and, therefore, defendant was innocent.

.... We disagree.

The state is not obligated to attempt to take fingerprints from articles allegedly touched by a defendant, *e.g. State v. Holmes,* 389 S.W.2d 30, 34 (Mo.1965), nor is it incumbent on the state to account for the absence of fingerprint evidence. *Id.* at 34. Thus, in closing argument, an adverse inference may not be drawn from the state's failure to take fingerprints. *E.g., State v. Terry,* 472 S.W.2d 426, 430 (Mo. banc 1971); *State v. Holmes, supra* at 34. This reasoning is applicable here. The state does bear the burden of presenting sufficient evidence to make a submissible case. However, the state is not bound to gather and present all physical evidence conceivably germane to its case in chief. More precisely, as noted, the state is not required to account for its failure to gather or present such evidence. *State v. Terry, supra; State v. Holmes, supra.* Thus, in the present case, the refusal of the trial court to permit defense counsel to draw the adverse inference in question was consistent with prior case law and logic.

611 S.W.2d at 560. *Simpson* is consistent with *State v. Holmes,* 389 S.W.2d 30 (Mo. 1965), in which this Court held the defendant was not entitled to draw an adverse inference from the State's failure to "take defendant's fingerprints from the articles he touched" at the crime scene. *Id.* at 34. Accordingly, defendant's contention is without merit.[7]

■ Defendant asserts that the court erred in denying his motion for change of venue in which he alleged that pretrial publicity and "the spectacular nature of the alleged offenses" created "a strong possibility of pervasive prejudice by the inhabitants of Jefferson County against the defendant which would preclude him from receiving a trial by a fair and impartial jury in this Circuit."

The decision to grant or deny a change of venue rests within the trial court's discretion, and its ruling will not be disturbed unless an abuse of discretion is demonstrated.[8] *State v. Boggs,* 634 S.W.2d 447, 457 (Mo. banc 1982). We find no such abuse in this case.

Supportive of his motion, defendant submitted 65 newspaper articles, radio broadcasts, or television reports pertaining to the case. He also adduced testimony from a State Representative and a Jefferson County Commissioner who were former neighbors of the victims. Of the media reports, 48 occurred within a month of the crime. In the three months prior to the trial, only six newspaper articles concerning the case appeared, all pertaining to such routine pretrial matters as the change of venue requests and jury selection, and there was no radio or television coverage.

Of course "[e]xposure to publicity is not deemed inherently prejudicial, and a juror may be sworn if he is able to set aside any opinion formed from the publicity when he enters the jury box." *State v. Molasky,* 655 S.W.2d 663, 667 (Mo.App.1983). As was noted in *Molasky:*

> In a metropolitan area the size of St. Louis, many crimes are reported, some of which are particularly violent or revolting.... The trial judge is in a better position to assess the effect of the publicity on the minds of the inhabitants of the county and to determine whether the people who reside in the county are so prejudiced against a defendant that a fair trial would be impossible.

*Id.* at 666.

The trial court's rejection of defendant's argument that the publicity in this case was so "intense and adverse that prejudice

---

7. *See also State v. Carpenter,* 710 S.W.2d 284, 286 (Mo.App.1986); *State v. Boyd,* 688 S.W.2d 791, 794 (Mo.App.1985); *State v. Crespo,* 664 S.W.2d 548, 553 (Mo.App.1983).

Defendant relies on *State v. Dethrow,* 510 S.W.2d 207 (Mo.App.1979) and *State v. Hall,* 687 S.W.2d 924 (Mo.App.1985). Insofar as those cases are contrary to *State v. Holmes,* 389 S.W.2d 30 (Mo.1965) and *State v. Simpson,* 611

S.W.2d 556 (Mo.App.1981) they are not to be followed.

8. This case does not involve Rule 32.03, pertaining to change of venue from counties having a population of seventy-five thousand or fewer inhabitants. Jefferson County had a population of more than 146,000 as of the 1980 census.

must be presumed" is supported by the record of the voir dire examination in this case. Less than half of the veniremen questioned had ever heard of the offenses with which defendant was charged. Those who had acquired some knowledge of the crimes were individually questioned concerning the source and extent of their information. Of these, some had seen nothing in the media, others had read only headlines or a single article and most of the rest remembered no details from the articles or broadcasts they had seen or heard; of the 65 veniremen who had some knowledge about the case, nine were excused for cause. Of the twelve venireman ultimately seated on the jury only two had heard of the case, and they manifested an ability to put aside any previous impression and evaluate the case fairly. We are mindful the trial court is in a far better position to evaluate and consider a venireman's demeanor than an appellate court, and "[i]t was within the legitimate province of the trial court to conclude that the jurors were not prejudiced against appellant as a result of whatever publicity they had seen." *Molasky*, 655 S.W.2d at 667. Significantly defendant makes no challenge to the trial court's rulings on his motions to strike veniremen for cause.

■ We need only briefly discuss one final point made by defendant about the venue of his trial. Defendant asserts that the "victims were socially active and lived a homosexual lifestyle tending to increase the likelihood that people closely associated with them would be less than candid on voir dire concerning their knowledge and bias concerning the case." Suffice it to say that defendant's argument is pure conjecture, unsupported by anything in the record. Defendant's point is ruled against him.

We now consider defendant's objection to the admission of a series of 29 black and white photographs depicting various stages of the autopsies conducted on the victims. Defendant contends the pictures were "cumulative, spectacularly gruesome, and unduly inflammatory," and that their prejudicial impact outweighed their probative value.

The trial court has broad discretion in the admission of relevant photographs, *State v. Guinan*, 665 S.W.2d 325, 331 (Mo. banc 1984), and "[a] photograph is admissible if it accurately depicts the scene and tends to prove any elements of the charged offense, including issues of identity, *condition* and location of the body, *nature and location of the wounds*, and the *cause of death*." *State v. Evans*, 639 S.W.2d 820, 822 (Mo. 1982) (emphasis added). The photographs in question were utilized by the pathologist during his testimony, and he explained matters depicted in each photograph. They showed the nature and location of the wounds sustained by the victims, and provided a pictorial reference for the pathologist as he testified concerning the victims' cause of death.

■ Defendant contends he was willing to stipulate to the nature and location of the wounds and argues the photographs were cumulative. However, a photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the State precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved. *Evans*, 639 S.W.2d at 822; *State v. Randolph*, 729 S.W.2d 524, 527 (Mo.App. 1987).

■ Although defendant describes the pictures as "spectacularly gruesome," they are black and white, not color; and while the photographs are not pleasant, "it is difficult to imagine how such photographs could conceivably have 'inflamed' the minds of the jury beyond the point to which they were otherwise inflamed by the ... evidence...." *State v. Duisen*, 428 S.W.2d 169, 173 (Mo. banc 1967). "Insofar as the photographs tend to be shocking or gruesome, it is because the crime is of that sort." *Guinan*, 665 S.W.2d at 331 (quoting *State v. Clemons*, 643 S.W.2d 803, 804 (Mo. banc 1983)). The court did not abuse its discretion in admitting the pictures in question.

Finally, defendant asserts that the death penalty constitutes cruel and unusual punishment under the United States and Missouri Constitutions. Defendant's constitutional attack upon the death penalty has been rejected with such frequency as to require no further discussion here. *See, e.g., State v. Driscoll*, 711 S.W.2d 512, 517 (Mo. banc 1986), *cert. denied*, — U.S. ——, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *State v. Newlon*, 627 S.W.2d 606, 611–613 (Mo. banc 1982), *cert. denied* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

Turning now to the statutorily mandated review in cases in which there has been imposition of the death sentence, Section 565.035, it becomes our duty to consider the punishment as well as any errors asserted on appeal. From our examination of the record we readily conclude that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor. The jury found a number of aggravating factors including three which are statutorily enumerated: (1) the victims were murdered by the defendant for the purpose of receiving money; (2) the murders involved torture and depravity of mind and as a result thereof were outrageously or wantonly vile, horrible or inhuman; and (3) the murders were committed while the defendant was engaged in the perpetration of burglary in the first degree. Six additional nonstatutory grounds were certified, all of which were amply supported by the record.

The facts surrounding the murders in question and the conduct of the defendant during their commission demonstrate the especially egregious nature of the crimes. The defendant and his coconspirators planned to burglarize and rob the home of the victims. They went armed with deadly weapons, including a sawed-off rifle, a sawed-off shotgun and a double edged knife. After Morgan kicked in the door to the home the victims were assaulted and bound with, among other things, Christmas lights and a dog chain was placed around the neck of victim Schwendemann. Thompson was initially stabbed in the neck and left to bleed to death. Somehow he managed to stagger outside, only to be recaptured and subjected to multiple stabbings in the chest, back, neck and throat, sustaining at least 15 stab wounds. Schwendemann was shot in the back, which apparently paralyzed him but left him conscious, and later shot in the head. The fatal stabbings, slashing and shootings were accompanied with the additional brutality of "stomping" and kicking Schwendemann so severely that two of his ribs were broken. The preplanned burglary was methodically carried out and a considerable quantity of "loot," consisting of the personal property of the victims, was taken and divided among the participants in the crime. Not only is there no showing of remorse on the part of this defendant, but to the contrary he demonstrated an offensive air of braggadocio when boasting to others how he brought about the deaths of the victims.

The record supports the jury's findings in all particulars as to the aggravating circumstances they certified and our independent review reveals the evidence against this defendant was indeed overwhelming.

The sentences of death were neither excessive nor disproportionate to the penalties imposed in similar cases considering the crimes, the strength of the evidence, and the circumstances surrounding the defendant. Among the many cases examined we note the following as representative of those quite similar: *State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987); *State v. Grubbs*, 724 S.W.2d 494 (Mo. banc 1987); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983); and *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982). The record reflects defendant's wanton disregard for the sanctity of human life.

The judgments and sentences of death are affirmed.

BILLINGS, C.J., and DONNELLY, ROBERTSON, and HIGGINS, JJ., concur.

BLACKMAR, J., dissents in separate opinion filed.

WELLIVER, J., dissents and concurs in separate dissenting opinion of BLACKMAR, J.

BLACKMAR, Judge, dissenting.

I agree with the holdings of the principal opinion, first, that the evidence amply supports the judgment, and, second, that the sentence of death is not disproportionate. I am of the opinion, nevertheless, that a new trial is necessary (1) because of the trial court's refusal to grant a change of venue on proper motion filed, and, (2) because of the rejection in limine of evidence regarding the lenient treatment of a co-participant in the crime as a part of a plea bargain.

The principal opinion brushes off these points by saying that both rulings involve the trial court's discretion. I believe that we should develop some standards for the guidance of trial judges on their discretionary rulings in death sentence cases, and should not use the concept of discretion as a license to affirm. It is important not only that trials meet minimum standards of fairness, but also that there be an appearance of fairness to the defendant and those who are interested in him. The more atrocious the crime, the graver the charges, the more important it is that the trial appear to be fair.

## I.

The defendant filed a timely motion for change of venue in proper form, asserting prejudice of the residents of the county on account of pretrial publicity. Because Jefferson County has more than 75,000 inhabitants, the defendant was obliged to support the motion by affidavit. *See* Section 545.490, RSMo 1986. Rule 32.04. He made a rather substantial showing that the circumstances of the double murder were well known in the county, but the trial judge brushed him aside. I believe that the motion should have been sustained.

The principal opinion minimizes the defendant's showing. The crime received widespread publicity and the venire was substantially impacted. The defendant has demonstrated the conditions which often

impel prudent defense attorneys to seek change of venue. It is hard to show actual effect, but the potential is present. We should send the message to trial judges that a timely motion for change of venue, properly supported, should ordinarily be granted.

The facts of this case may not be so dramatic as in *Shepard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) which held that change of venue was required as a matter of federal law. But we should not set our requirements at the minimum federal standard. We should, rather, apply the long Missouri tradition of change of venue so that, when the circumstances of a crime are widely publicized the case is taken to another county where few people have heard of it. It is proper to require a showing in the larger counties, rather than allowing an automatic change, but when the record shows information which shows reason for serious concern the change should be allowed.

I am afraid that future trial judges, fortified by the principal opinion will follow the line of least resistance by leaving the case where it is. We should instruct them to grant the change if there is any troubling doubt.

## II.

I believe that the jury in considering the sentence of death, is entitled to know the disposition of the cases of co-participants. It is not enough to say that this evidence does not relate to the offense or to the defendant. The jury should have before it all evidence which a reasonable person would consider important in determining the sentence. I am sure that jurors would want to know how co-participants have fared.

When the state strikes a plea bargain and the bargaining defendant testifies, the sentence received or promised may be introduced by the defense as impeaching evidence. Thus the point presented by this

**406**

record will seldom arise. I would not deprive the jury of the information simply because the prosecution elects not to put the bargaining witness on the stand in the particular case.

The principal opinion indicates that the jury is not entitled to make a proportionality review, because that review is the function of the Court. Yet the opinion also points out that we will give no consideration to the sentence imposed on a potential defendant who pleads guilty to a lesser offense. *State v. Bolder*, 635 S.W.2d 673 (Mo. banc 1982). Under the principal opinion, there will be no proportionality review as to a defendant who makes a plea bargain, unless the bargainer testifies.

The principal opinion cites federal cases and suggests that they are distinguishable. Once again we should insist on more than the minimum compliance with federal standards. It is important to have some uniformity in the infliction of capital punishment. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The defendant should be able to submit for consideration, at some stage of the case, the possibility that others who share his guilt have been punished relatively lightly. Our trial courts should be lenient rather than grudging in allowing the capital defendant to present evidence which might possibly induce jurors to consider leniency.

I would reverse and remand for a new trial which, because of the change of venue issue, must cover both guilt and punishment.